ZIONS FIRST NATIONAL BANK, N/A

v.

UNITED HEALTH CLUBS, INC., Chu Liquidating Corp. and Financial Enterprises of America, Inc.

UNITED HEALTH CLUBS, INC.

v.

ZIONS FIRST NATIONAL BANK, N/A Chu Liquidating Corp.

Civ. A. Nos. 80–2060, 80–3283.

United States District Court,
E. D. Pennsylvania.

March 5, 1982.

5. 29 U.S.C. § 185(a) (1976).

6. *United Parcel Service, Inc. v. Mitchell*, 451 U.S. 56, 59, 101 S.Ct. 1559, 1562, 67 L.Ed.2d 732 (1981).

John L. Jenkins, Philadelphia, Pa., for Zions First Nat. Bank, N/A.

Robert W. Maris, Philadelphia, Pa., for United Health Clubs, Inc., Chu Liquidating Corp. and Financial Enterprises of America, Inc.

## SUR PLEADINGS AND PROOF

LUONGO, District Judge.

These consolidated diversity actions involve the validity of a leasehold mortgage given to Zions First National Bank (Zions) by CHU Liquidating Corporation, formerly United Health Clubs, Inc. (hereinafter referred to as Old United), as security for a debt owed to Zions by Financial Enterprises of America, Inc. (FEA), the parent corporation of Old United. Upon FEA's and Old United's default in payment on the debt to Zions, Zions commenced this action seeking a judgment on the debt instrument and also an order of foreclosure on the leasehold estate now occupied by Old United's assignee, United Health Clubs, Inc., formerly UHC, Inc. (hereinafter referred to as New United). Subsequently, New United commenced a quiet title action against Zions and Old United in the Court of Common Pleas for Philadelphia County, seeking a declaration that Zions' mortgage was invalid because, when it was given, the leasehold

interest which the mortgage secured had already been terminated by the execution of a superseding lease between the landlord and Old United. Zions removed the quiet title action to this court. On January 28, 1981, the foreclosure action and the quiet title action were consolidated for all purposes. In August, 1981, I permitted New United to amend its complaint against Zions to add a claim for defamation of credit and interference with business opportunity.

The case was tried on October 13–14, 1981. Thereafter the parties submitted requests for findings of fact and conclusions of law, together with memoranda of law. On pleadings, proof, and the written submissions of the parties, I make the following

## FINDINGS OF FACT

### A. *The Foreclosure and Quiet Title Claims*

1. Zions First National Bank, N/A (Zions), plaintiff in the foreclosure action and defendant in the quiet title action, is a national banking association with its principal place of business at One South Main Street, Salt Lake City, Utah 84111 (T.13).

2. United Health Clubs, Inc., formerly UHC, Inc. (hereinafter New United), defendant in the foreclosure action and plaintiff in the quiet title action, is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business at 4600 City Line Avenue, Philadelphia, Pennsylvania 19131 (T.13).

3. CHU Liquidating Corporation, formerly United Health Clubs, Inc. (hereinafter Old United), defendant in both the foreclosure action and the quiet title action,[1] is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business at Union Hills Building, West Conshohocken, Pennsylvania 19428 (T.14).

4. Financial Enterprises of America, Inc. (FEA), defendant in the foreclosure action, is a corporation organized and existing under the laws of the State of Colorado, registered to do business in Pennsylvania, with its principal place of business at Union Hills Building, West Conshohocken, Pennsylvania 19428 (T.14). FEA is the parent corporation of Old United (T.14).

5. The premises which are the subject of this action are located at 4600 City Line Avenue, Philadelphia, Pennsylvania (T.14). More particularly, the premises are described as follows:

ALL THAT CERTAIN lot or piece of ground, SITUATE in the 52nd Ward of the City of Philadelphia described as follows, to wit: BEGINNING at a point on the Southeasterly side of City Avenue (as laid out 80 feet wide) at the distance of 592,950 feet Southwestwardly from the Westerly side of Belmont Avenue (100 feet wide) thence extending Southeastwardly at right angles to the said City Avenue the distance of 227,531 feet to a point, thence South 84 degrees 34 minutes 58 seconds East 32.140 feet to a point on the Northerly side of Overbrook Avenue (50 feet wide), thence Westwardly and Southwestwardly along the Northerly and Northwesterly side of said Overbrook Avenue on the arc of a circle curving to the left having a radius of 176,224 feet the arc distance of 210.225 feet to a point thence Northwestwardly at right angles to the said City Avenue crossing the Southeasterly side of City Avenue (80 feet wide) 258.320 feet to a point on the Southeasterly side of City Avenue (50 feet wide) thence Northeastwardly along the Southeasterly side of City Avenue (50 feet wide) said line being parallel with and 15 feet Northwestwardly from the Southeasterly side of City Avenue (80 feet wide); 171.605 feet to a point, thence Southeastwardly at right angles to the said City Avenue a distance of 15 feet to a point on the Southeasterly side of City

---

1. For jurisdictional purposes, CHU Liquidating Corporation must be realigned as a plaintiff in the quiet title action because (1) its interest is not adverse to that of New United, the named plaintiff in the quiet title action, and (2) New United traces its right to the premises at 4600 City Line Avenue directly from CHU Liquidating Corporation.

Avenue (80 feet wide) being the first mentioned point and place of beginning. No. 4600 City Line Avenue.

(Exhibit A to Complaint in 80–3283).

6. The premises are owned by 4600 City Line Corporation (City Line), which is not a party to this lawsuit (T.14).

7. Germantown Savings Bank (GSB) holds a first mortgage on City Line's fee interest in the premises (T.45). As a condition of the mortgage agreement between City Line and GSB, City Line agreed to obtain GSB's permission before leasing or otherwise transferring the premises to any individual, corporation or association having a net worth of less than $350,000 (T.45, Z–26).

8. By agreement of lease dated October 4, 1967 (the 1967 lease), City Line leased the premises to Spa Health Clubs, Inc. for a 20 year term commencing January 1, 1969, with monthly rental payments of $3,000 (Z–1).

9. The 1967 lease agreement contained several provisions, but for purposes of this action, only two are pertinent:

(a) Paragraph 14(c) provided, *inter alia*, that the lessor retained the right to relet the premises in the event of a default by the lessee in the payment of rent (Z–1, ¶ 14(c)).

(b) Paragraph 27(a) gave the lessee the right to assign its interest, without the consent of the lessor, so long as the assignee had a net worth of at least $350,000 (Z–1, ¶ 27(a)). This paragraph was apparently included in the lease to prevent any problems between City Line and GSB (*see* Finding 7).

10. On February 28, 1968, City Line and Spa Health Clubs, Inc. agreed to amend the 1967 lease (Z–2), and a memorandum of the 1967 lease, as amended, was recorded with the Department of Records of Philadelphia on December 17, 1970 (Z–3).

11. In 1971, Lee Schoonmaker and a small group of investors established FEA. Schoonmaker became FEA's president (T.163–64).

12. FEA was essentially a financing company; its operations consisted of purchasing installment sales contracts for health spa services from health spa operators. These contracts were purchased at discount and on a full recourse basis. Thus, if a spa member defaulted under his membership contract, FEA could seek payment directly from the spa operator that sold it the contract (T.163–64).

13. FEA's operations required large amounts of cash. In 1972 FEA began borrowing substantial sums from Zions to meet its funding needs. By March, 1973, FEA had a $1 million line of credit with Zions (T.165).

14. Spa Health Clubs, Inc., the named lessee under the 1967 lease agreement (*see* Finding 8), was one of the health spas from which FEA purchased membership contracts (T.165).

15. In early 1974, Spa Health Clubs, Inc. encountered financial difficulties, and its president, Don Parry, defaulted on the agreement with FEA to reimburse FEA for those contracts purchased by FEA that had gone bad. *See* Finding 12. (T.166–67).

16. On February 4, 1974, City Line's rental agent, I. David Pincus, notified Don Parry by letter that (1) Spa Health Clubs, Inc. was delinquent with its rental payments for January and February of 1974 and (2) the landlord would institute legal proceedings if immediate payment were not forthcoming (U–1).

17. If Spa Health Clubs, Inc. stopped offering services to its members, those contracts which FEA had purchased from Spa Health Clubs, Inc. would be worthless. On February 15, 1974, to protect its investment, FEA exercised a right in its agreement with Spa Health Clubs, Inc. to assume operations of the four spas then owned by Spa Health Clubs, Inc., including the spa located at 4600 City Line Avenue in Philadelphia (T.166–67).

18. On March 5, 1974, FEA and City Line executed an interim lease agreement whereby City Line would exercise its rights under paragraph 14(c) of the 1967 lease (*see*

Finding 9(a)), terminate Spa Health Clubs, Inc.'s interest under that lease, and relet the premises to FEA for the remainder of the original twenty-year term at the same terms and conditions, including the $3,000 per month rental. The interim lease agreement also provided that it would be superseded by a new lease agreement, "upon the same terms and conditions," to be executed by City Line and an FEA subsidiary (T.167–68) (U–3).

19. On March 6, 1974, City Line notified Spa Health Clubs, Inc. that it was exercising its rights under paragraph 14(c) of the 1967 lease (U–2).

20. Shortly after assuming management of the four spas, FEA transferred operation of the 4600 City Line Avenue spa to Old United, its wholly-owned subsidiary (T.169–70).

21. In June or July 1974, Don Parry brought suit against FEA, Old United and others in the Court of Common Pleas of Philadelphia, seeking to regain the premises. This suit was settled by an agreement dated August 9, 1974 (Z–46). As part of the settlement, Spa Health Clubs, Inc. assigned all of its right, title and interest in the 1967 lease to Old United (T.170).

22. The written assignment dated August 8, 1974, of the 1967 lease (Z–4) could not be recorded by Old United because it had not been properly notarized (U–10A).

23. As contemplated by the March 5, 1974 interim lease agreement between FEA and City Line (*see* Finding 18), a new lease, also dated March 5, 1974 (the 1974 lease) (U–4, Z–5), was executed by Old United and City Line on September 13, 1974 (T.16, 169). The 1974 lease contained the same terms as the 1967 lease, including the $3,000 per month rental and the termination date of January 1, 1989. (*Compare* U–4 *with* Z–1).

24. The 1974 lease was not recorded until December 22, 1977, after Old United had assigned its interest under the 1974 lease to New United (*see* Finding 57 *infra*). Old United did not record the 1974 lease because it feared that GSB, whose consent to

the lease had not been obtained as required under the mortgage from City Line (*see* Finding 7), would foreclose if it learned of the lease to Old United (T.60–63) (U–10A).

25. As of September 13, 1974, Old United could trace its interest in the premises at 4600 City Line Avenue to (1) the agreement of lease dated October 10, 1967 between Spa Health Clubs, Inc. and City Line, which had been assigned to Old United by Spa Health Clubs, Inc. on or about August 8, 1974 (*see* Findings 8 & 21), and (2) the 1974 lease between itself and City Line (*see* Finding 23).

26. In 1974, FEA was named as one of several defendants in a large securities litigation in United States District Court in Utah. The defense of this suit substantially depleted FEA's resources and caused it to fall behind on its payment of principal and interest to Zions (T.171–75).

27. On November 26, 1975, FEA gave Zions a renewal note for $375,000 payable on demand or on November 25, 1976 (T.205).

28. On June 21, 1976, Old United mortgaged its interest under the 1967 lease to Zions to secure the debt owed to Zions by its parent corporation, FEA, under the 1975 note. (Z–6). The mortgage had been drafted by Old United's counsel (T.179).

29. At the time the mortgage was given:

(a) FEA was in default on its obligation under the 1975 note to make quarterly interest payments to Zions (T.170–72).

(b) FEA was indebted to Zions for the principal amount of $277,000 plus interest (T.193).

(c) Old United was indebted to FEA in the amount of $499,311 (T.193).

30. In exchange for the leasehold mortgage from Old United, Zions agreed to defer quarterly interest payments on the 1975 note from FEA (T.71–72) (Z–19, p.5).

31. At the time Old United gave Zions the mortgage on its 1967 leasehold interest, Lee Schoonmaker, Old United's president, was aware of the existence of the 1974 lease. Nevertheless, Schoonmaker intended

that Zions would have a valid lien (T.217–18).

32. Since the original leasehold mortgage was in the possession of Old United, Zions could not record the mortgage, and despite Zions' repeated pleas, Old United did not record the mortgage until January 12, 1977 (T.77–78) (Z–25).

33. In late summer of 1976, Angus Belliston, a vice president in Zions' commercial loan department, assumed responsibility over the loan to FEA, replacing Jerry Holyoak who had been transferred to another position within the bank. On September 30, 1976, Belliston had his first real contact with the loan to FEA when he met with Schoonmaker at Holyoak's office in Salt Lake City, Utah. The purpose of this meeting was to acquaint Belliston with Schoonmaker and to discuss the status of the FEA loan. Also discussed at this meeting was FEA's failure to record the leasehold mortgage as it had promised to do. Schoonmaker gave assurances that he would see that the mortgage was recorded on his return to Philadelphia (T.33–36). No mention was made at that time by either Holyoak or Schoonmaker of any proposal to create a new corporation (T.226–27).

34. On December 9–10, 1976, Belliston met with Schoonmaker at Philadelphia. At these meetings, Belliston reviewed FEA's operations, including those of Old United, and examined FEA's financial condition. Discussions with Schoonmaker involved renewal of the November 1975 note (which had matured on November 25, 1976, and was now in default). In addition, Schoonmaker presented a new loan proposal to Zions which was designed to insulate FEA's most viable asset, the spa at 4600 City Line Avenue, from any adverse judgment which might be entered against FEA in the Utah securities action. (See Finding 26). Under Schoonmaker's plan, FEA would sell the Philadelphia spa and all its assets, including its lease, for "full value" to a new corporation to be created by Schoonmaker and a few other FEA stockholders. Zions' role under Schoonmaker's plan was twofold:

(a) First, Zions would lend to the new corporation money to be used to satisfy FEA's debt to Zions.

(b) Second, Zions would release the FEA accounts receivable then held as collateral, and, as collateral for the loan to the new corporation, take a mortgage, first on Old United's leasehold and then, when created, on the leasehold of the new corporation.

The advantages of this plan, according to Schoonmaker, were that it would permit the new corporation to completely sever its relation with FEA (thereby shielding it from FEA's creditors), and would enable the new corporation to offer its initial accounts receivable to another lender as collateral for a loan for vitally needed working capital (T.38–44). (Z–19).

35. Belliston did not agree on behalf of Zions at their December 9–10 meeting to accept Schoonmaker's proposal to release FEA as the primary obligor on its note (T.226–27).

36. Shortly after the December 9–10 meetings in Philadelphia, Zions' loan committee decided that it would renew the 1975 note to FEA subject to two conditions. First, the renewal note would have to be guaranteed by Lee Schoonmaker personally, and by Old United, and FEA National Adjustment Services, Inc., a wholly-owned subsidiary of FEA. Second, FEA would have to supply Zions with all documentation necessary to perfect the bank's collateral, including evidence that the leasehold mortgage had been recorded (T.50–55) (Z–20).

37. At the time Zions determined to renew the note to FEA, it also decided that it would agree to Schoonmaker's proposal to sell the spa assets to a new corporation, with one important modification. Instead of lending money directly to the new corporation and releasing FEA, as envisioned by Schoonmaker (see Finding 34), Zions would permit the new corporation to assume FEA's obligation to the bank. Zions would continue to hold the FEA accounts receivable as collateral, and FEA would remain primarily liable on the debt, at least until Zions was given adequate assurances that

the new corporation was viable and the sale of assets could not be upset by FEA's creditors. However, before agreeing to this modified proposal, it was imperative to Zions that the leasehold mortgage be recorded and otherwise perfected to the point where title insurance could be procured (T.232–42).

38. On January 2, 1977, Jerry Holyoak, at Belliston's request, went to Philadelphia to communicate Zions' decisions to Schoonmaker. Holyoak took with him all documentation necessary to renew the note (Z–8 to Z–11), and a letter from Zions to Schoonmaker stating Zions' agreement to his proposal as the bank understood it. (Z–21). Holyoak was instructed to show the letter to Schoonmaker, but not to deliver the letter until satisfied that the leasehold mortgage had been perfected to the point where title insurance could be procured (T.50–56).

39. At the January 2 meeting with Holyoak, Schoonmaker executed the renewal promissory note, dated December 4, 1976 (Z–8), as well as the corresponding security agreements (Z–9 to Z–11). Also, as instructed (see Finding 38), Holyoak showed Schoonmaker the letter indicating the terms of Zions' agreement to his plan. Schoonmaker read the letter, but it was not left with him because the leasehold mortgage still had not been recorded (T.56).

40. On January 11, 1977, Belliston phoned Ted Young of the law firm of Dilworth, Paxson, Kalish & Levy, who was representing FEA, and learned that the leasehold mortgage still had not been recorded (T.59–60).

41. Belliston phoned Young again on January 17, and learned that the leasehold mortgage had finally been recorded. Young also told Belliston that title insurance could not be procured since Old United did not have record title under either the 1967 lease (since the assignment of the 1967 lease to Old United had never been recorded) or the 1974 lease (which had not been recorded). Belliston advised Young that Zions would not agree to the new proposal until the leasehold mortgage was perfected to the point where title insurance could be obtained (T.60) (U–10A).

42. The next day, January 18, 1977, Belliston phoned Schoonmaker, who told him that he would "sign new mortgage and record new lease." I interpret this to mean that Schoonmaker proposed to record the 1974 lease and give Zions a mortgage on the 1974 leasehold. Later that day, Belliston phoned Young and obtained confirmation that Old United would record the 1974 lease or a memorandum thereof, and that Old United would execute and record a new leasehold mortgage of the 1974 lease (T.60–61) (U–10A).

43. On January 21, 1977, Belliston phoned Young again and was told that the 1974 lease could not be recorded without risking foreclosure by GSB which held a mortgage on the fee at 4600 City Line Avenue. (See Finding 7). Since City Line had never obtained GSB's consent to the 1974 lease, as required by the mortgage agreement, recordation of the 1974 lease could alert the bank and result in a foreclosure on the fee, thus destroying Old United's leasehold interest (T.61–62) (U–10A).

44. The January 21 phone call to Young was Belliston's last contact with the FEA loan. On February 1, 1977, Belliston was transferred to another position within the bank and Grant Misbach, a Zions' vice president, assumed Belliston's responsibilities with respect to the loan to FEA (T.62 & 79).

45. On February 16, 1977, Ted Young, FEA's attorney, sent Misbach a certified copy of the leasehold mortgage (Z–24), verifying that the mortgage had been recorded on January 12, 1977. In a letter accompanying the copy of the mortgage, Young stated: "This firm makes no representation regarding the effect of recording the Leasehold Mortgage" (Z–23). By that statement, Young meant to put Zions on notice that, without recordation of either the assignment of the 1967 lease or the 1974 lease, a bona fide purchaser might be able to cut off Zions' interest (see Finding 41).

46. Subsequent to the receipt of Young's letter of February 16, Misbach made several unsuccessful efforts to get the 1974 lease

recorded. It was Misbach's belief, albeit incorrect, that recordation of the 1974 lease was the only impediment to perfecting the mortgage. Once the new lease was recorded, Misbach felt that title insurance could be obtained (T.126–32). Angus Belliston, however, had learned on January 18, 1977 that this was not correct (*see* Finding 41).

47. On March 10, 1977, Misbach telephoned Schoonmaker in an attempt to collect past due interest on Zions' note from FEA. During this conversation, Schoonmaker explained the origin of the two leases, the relationship between City Line and GSB, and why the 1974 lease could not be recorded. Misbach was told, however, that the 1974 lease could be assigned to a new corporation, without the consent of GSB, provided the new corporation had a capitalization of at least $350,000. After the assignment, the 1974 lease could then be recorded, together with the assignment of lease. (Ultimately this is what took place. *See* Finding 58 *infra*). After informing Misbach of Old United's leasehold situation, Schoonmaker reiterated his plan to form a new corporation to purchase the assets of Old United. Misbach was also told that a meeting of FEA's shareholders had been scheduled for March 26, 1977 to announce the decision to sell the Philadelphia spa and its assets to a new corporation for $750,000 (T.81–86) (Z–26).

48. Schoonmaker formally presented his plan to Misbach at Misbach's office in Salt Lake City on June 21, 1977. At this meeting, Misbach was shown the proposed closing documents for the sale of Old United's assets to a new corporation to be known as UHC, Inc. To accommodate the plan, Schoonmaker requested Zions to (1) lend UHC, Inc. $277,000 which would be used to pay off the note from FEA; (2) release FEA from its obligation to the bank; (3) release the FEA accounts receivable then held as collateral, and (4) release its leasehold mortgage and take a second leasehold mortgage behind another bank. Misbach told Schoonmaker that it was very unlikely that Zions would agree to this scheme. Schoonmaker gave Zions a few days to make a decision (T.87–90) (Z–27).

49. A few days later, Misbach called Schoonmaker and told him that Zions could not accept the terms of the proposal (T.89).

50. At the time of his June 21 meeting with Schoonmaker, Misbach was unaware that UHC, Inc. had already been incorporated with Schoonmaker as president. Misbach was also unaware that an agreement of sale had already been entered into between Old United and UHC, Inc. on March 26, 1977 (T.93).

51. Under the terms of the March 26, 1977 sale agreement (Z–47B), Old United agreed to sell its interest under the 1974 lease, the leasehold improvements, the spa furniture and equipment, and the United Health Clubs trade name to UHC for $750,000. Lee Schoonmaker executed the agreement of sale on behalf of FEA, Old United and UHC, Inc. (Z–47B).

52. The closing on the sale of Old United's assets occurred on July 1, 1977, with Ted Young of Dilworth, Paxson, Kalish & Levy representing Old United, and Marc Kaplin of Lesser, Kaplin & Blumfield representing UHC, Inc. (T.218). At that time, the following documents were executed:

(a) An assignment and assumption of lease, wherein Old United assigned its interest under *the 1967 lease* to UHC, Inc. This document was signed by Lee Schoonmaker as president of both corporations (Z–13).

(b) A leasehold mortgage of UHC, Inc.'s interest under the 1967 lease, given to Old United to secure a $300,000 debt owing from UHC, Inc. to Old United. This document was executed by Schoonmaker as president of UHC, Inc. (Z–48).

(c) A leasehold mortgage of UHC, Inc.'s interest under the 1967 lease, given to Old United to secure a $180,000 debt owing from UHC, Inc. to Old United. This document was executed by Schoonmaker as president of UHC, Inc. (Z–49).

(d) A leasehold mortgage of UHC, Inc.'s interest under the 1967 lease, given to National Credit Corporation to secure a $150,000 debt owing from UHC, Inc. to National

Credit Corporation. This document was executed by Schoonmaker as president of UHC, Inc. (Z–50).

All of the closing documents were recorded on July 14, 1977 (see Z–13 & Z–48 to Z–50).

53. Schoonmaker was president of UHC, Inc. (see Finding 50). Accordingly UHC, Inc. had actual knowledge that the property interest assigned to it by Old United was subject to Zions' leasehold mortgage.

54. The July 1, 1977 agreement assigning the 1967 lease to New United stated: "Assignor hereby assigns all of its right, title and interest in and to the Lease to the Assignee, Assignee to have and to hold the same from the date of this Assignment and all of the remainder of the term mentioned in the Lease and any renewals and extensions thereof" (Z–13). Since New United had actual and constructive knowledge of Zions' mortgage on the 1967 leasehold, New United knew that the interest assigned to it on July 1, 1977 by Old United was subject to Zions' outstanding mortgage.

55. The $750,000 purchase price was paid by UHC, Inc. as follows: (a) $300,000 of preferred stock issued by UHC, Inc. to FEA. (In 1978, these shares were converted to notes and offered to shareholders of FEA); (b) $270,000 in notes from UHC, Inc. to creditors of FEA who had released claims against FEA. (All of these creditors were also shareholders of FEA); (c) $180,-000 in the form of a note from UHC, Inc. to FEA. No cash was exchanged on the sale (T.214–16).

56. On July 29, 1977, UHC, Inc. changed its corporate name to United Health Clubs, Inc. (New United). On that same day, Old United changed its name to CHU Liquidating Corporation (T.18).

57. New United has continuously owned and operated the health spa at 4600 City Line Avenue from July 1977 to the present (T.27).

58. Old United's interest under the 1974 lease agreement was not assigned to New United until December 22, 1977. The 1974 lease agreement and the assignment there-of to New United were then recorded (Z–47).

59. Misbach believed that the cooperation of Zions was absolutely essential to the implementation of Schoonmaker's plan. Accordingly, when Zions refused to accept Schoonmaker's terms (see Findings 48–49), Misbach assumed that Schoonmaker would not go ahead with the sale of the spa's assets. Misbach and Zions did not learn of the sale and the change of corporate names until shortly before December 30, 1977 when Misbach, suspecting that Schoonmaker had gone ahead and formed the new corporation, called the Secretary of State of the Commonwealth of Pennsylvania and confirmed his suspicions (T.99–103) (Z–34).

60. After rejecting Schoonmaker's proposal in June 1977 (see Findings 48–49), Misbach made several unsuccessful efforts either to obtain payment of, or to renew, the 1976 note from FEA (see Finding 39) which had been past due since May 1977 (T.90–100) (Z–28 through Z–33).

61. Finally, on April 20, 1978, Misbach met with Schoonmaker in Philadelphia to discuss renewal of the past due note from FEA. At that time Schoonmaker proposed splitting the $240,000 obligation of FEA into two notes: (1) a $60,000 note from FEA secured by the FEA receivables then held by Zions, and (2) a $180,000 note from New United secured by a second leasehold mortgage behind Provident National Bank. Misbach told Schoonmaker that it was unlikely that Zions would agree to this scheme because it would involve subordinating its existing first leasehold mortgage. Instead, Misbach proposed that Schoonmaker agree to a renewal of the past due note on a demand basis (T.110–113) (Z–38).

62. Approximately two weeks after the April 20 meeting, a renewal note for $240,-000 dated March 28, 1978, was executed by Schoonmaker on behalf of FEA, Old United, and FEA National Adjustment Services, Inc. (T.114–15) (Z–12).

63. The last payment on account of principal on the March 28, 1978 renewal note was made on October 23, 1978. The last

payment of interest was made on March 29, 1979 (T.28–28, 123).

64. By letter dated October 9, 1979, John H. Allen, counsel for Zions, placed FEA and FEA National Adjustment Services, Inc. on notice of their default under the March 28, 1978 note (Z–14).

65. By letters dated October 22, 1979, Louis A. Cicalese, counsel for Zions, advised FEA, Old United, and FEA National Adjustment Services, Inc. that the March 28, 1978 note was in default and demanded full payment of all outstanding principal and interest by November 1, 1979 (Z–15 to Z–18).

66. As of October 13, 1981, the date of trial, the total unpaid principal balance on the March 28, 1978 note was $225,000, and the total unpaid interest was $48,562.05, with interest accruing thereafter at the rate of $62.05 per day (T.123).

67. The leasehold mortgage executed by Old United in favor of Zions provides that, in the event of a default by FEA on its obligation to Zions, Zions may recover an attorney's commission of 5%, together with the costs of suit (Z–6).

### B. New United's Claim for Defamation of Credit and Interference with Business Opportunities

68. In the summer of 1977, New United borrowed approximately $139,000 from Provident National Bank to cover operating expenses of the spa (T.264–66). This loan was secured by a leasehold mortgage on the spa premises and by Schoonmaker's personal guarantee (T.246).

69. On February 15, 1978, Jerry Holyoak of Zions received a telephone call from Dave Sweet of Provident National Bank. Sweet informed Holyoak that Provident had extended credit to FEA and sought to exchange credit information with Zions concerning FEA and Schoonmaker. Sweet suggested that Zions contact Margey Cobb of Provident if additional information on Provident's loan to FEA was desired (T.103–04) (Z–35).

70. On March 10, 1978, Misbach telephoned Margey Cobb of Provident National Bank to exchange credit information. At that time, Misbach learned that Provident's loan was not to FEA but to New United which was not a customer of Zions. Provident's loan to New United, however, was secured by a leasehold mortgage on the spa premises and by Schoonmaker's personal guarantee. Zions' loan to FEA was secured by the same collateral (T.105–06, 246–48) (Z–36).

71. On March 26, 1978, Misbach telephoned Schoonmaker to discuss the renewal of the FEA note to Zions. During this conversation, Schoonmaker told Misbach that he knew that Misbach had contacted Provident. Schoonmaker expressed displeasure that Zions had done so (T.248–49) (Z–37).

72. On or about September 15, 1978, after several unsuccessful efforts to obtain payment from FEA on the 1978 renewal note (*see* Finding 60), Misbach telephoned Cobb once again to exchange credit information. Misbach told Cobb that FEA had failed to make monthly principal reduction payments on its note since May, 1978. Misbach also told Cobb that several efforts had been made to get in touch with Schoonmaker, but that Schoonmaker had refused to return any calls from Zions (T.118, 251–56) (Z–41).

73. The last contact between Zions and Provident occurred on September 20, 1978, when Cobb returned Misbach's call of September 15, 1978 (Z–41).

74. All of the information which Zions gave Provident was truthful and accurate credit information (T.250–56), and was given in accordance with common and accepted banking practice (T.245–53).

75. The $139,000 loan from Provident to New United was repaid in June, 1979, three months prior to maturity (T.264–66).

76. After repaying the loan from Provident, New United sought an additional loan in late August or early September of 1979. New United intended to use the proceeds of this loan to renovate the spa facility at 4600

City Line Avenue. New United's loan application was denied by Provident and by two other banks as well (T.268–69).

77. Due to its inability to obtain financing to renovate the spa, New United was forced to delay renovation for two years, until sufficient profits could be retained to pay for the renovations (T.269).

78. The cost of renovations was projected at $75,000 in 1979. The two-year delay in construction resulted in a completion cost of approximately $127,000 (T.269–70).

79. New United estimates that if the renovations had been completed in 1979 as planned, it could have realized approximately $28,751 in utility cost savings (T.270–72).

80. New United's complaint in the quiet title action was filed on June 20, 1980, and amended in August 1981 to add the claim for defamation of credit and interference with business opportunity. (Documents No. 1 & 9 in C.A. 80–3283).

## DISCUSSION

### A. *The Foreclosure and Quiet Title Claims*

The bulk of the evidence presented during the trial of this case concerned whether or not Zions had agreed to a novation proposal that had been presented to it by Lee Schoonmaker in his capacity as president of FEA and Old United. Schoonmaker testified that the object of his proposal was to protect the assets of the spa at 4600 City Line Avenue from FEA's creditors by selling the spa to a new corporation to be created by himself and a few other FEA shareholders. To assist the financing of this new corporation, Schoonmaker asked Zions to make a loan to the new corporation, the proceeds of which would be used to satisfy FEA's obligations to the bank, and to release the FEA accounts receivable securing the FEA note. The new corporation could then offer these accounts receivable to another financial institution as collateral for a loan of working capital.

FEA and Old United attempted to prove at trial that Zions had in fact agreed to accommodate Schoonmaker's plan by acceding to his requests to release FEA in exchange for a note from the new corporation. However, during closing arguments, counsel for FEA and Old United abandoned that position conceding that the evidence simply did not support it.[2]

■ Apart from the now moot factual issue pertaining to the alleged novation, there is basically no dispute as to the remainder of the facts bearing on the mortgage foreclosure and quiet title claims. Accordingly, FEA and Old United admit that they are in default on the March 28, 1978 promissory note and do not contest entry of judgment against them for the amount due on the instrument. New United, however, contends that it cannot be held liable on the note because it was never a party to it. Inasmuch as New United did not sign the note, either as maker or guarantor, I agree that New United cannot be held liable on the instrument. 13 Pa.Cons.Stat.Ann. § 3401.

The more interesting question before me is whether Zions is entitled to seek to satisfy its claim against FEA and Old United out of the proceeds of a foreclosure sale of New United's leasehold on the premises at 4600 City Line Avenue. There is no doubt that New United began its operations in the premises under the 1967 lease which had been assigned to it by Old United on July 1, 1977. Further, it is beyond dispute that New United had actual knowledge that its interest under the 1967 lease was subject to Zions' mortgage. In fact, on July 1, 1977, New United, by its president Lee Schoonmaker, gave mortgages of its interest under the 1967 lease to Old United and another creditor. Notwithstanding these facts, New United raises two separate challenges to the legal validity of Zions' mortgage. New United contends that (1) no consideration was given by Zions for the mortgage, and (2) Zions' mortgage is worthless be-

---

2. Independent of the concession of counsel for FEA and Old United, my findings of fact reject

Schoonmaker's testimony that Zions agreed to accept the proposal to release FEA.

cause the 1967 lease which secures it is a nonexistent estate in real property, having been superseded by the 1974 lease agreement.

■ New United's first contention, that Zions' mortgage lacks consideration because it was given to secure an antecedent debt, is not supported by my findings. Although the mortgage was given in 1976 to secure the November 26, 1975 note from FEA, Zions agreed to defer quarterly interest payments on the 1975 note in exchange for the mortgage from Old United (Finding 30). This was legally sufficient consideration for the mortgage. *See Saalfield v. Manrow*, 165 Pa. 114, 30 A. 823 (1895).

■ New United's second challenge is to the legal validity of Zions' mortgage. New United suggests that the proper method of resolving the issue of the validity of Zions' mortgage is to first adjudicate the quiet title claim. Under this approach, New United maintains that the 1974 lease is the only true and valid lease, and is the lease under which it is presently operating. From this conclusion, New United argues that Zions' mortgage is totally worthless.

New United's argument that Zions' leasehold mortgage is a nullity is based upon *Schuchart v. Brillhart*, 64 York 136 (C.P. 1950), wherein the court stated:

> As to the effect of a new lease between the same parties or their successors in interest entered into during the existence of a prior lease or a renewal thereof for the same property, it has been consistently held that the new lease revokes the old.

*Id.* at 137. The court in *Schuchart* relied upon the Pennsylvania Supreme Court's decision in *Klugh Estate*, 362 Pa. 166, 66 A.2d 822 (1949). In that case, the court held that the petitioner could not obtain specific enforcement of an option to purchase contained in a lease because he had entered into three subsequent leases for the same property, none of which contained an option to purchase. The court based this conclusion on the *Restatement of Contracts*, § 408, which provides

> A contract containing a term inconsistent with a term of an earlier contract between the same parties is interpreted as including an agreement to rescind the inconsistent term in the earlier contract. The parties may or may not at the same time agree to rescind all the other provisions of the earlier contract....

New United's reasoning is uncomplicated. On September 13, 1974, when the 1974 lease between City Line and Old United was executed, the 1967 lease was superseded and no longer existed. Thus, two years later, when Zions took a mortgage of Old United's interest under the 1967 lease, Zions took nothing. New United further maintains that, without the concurrence of the landlord, nothing could be done by Old United to revive the 1967 lease.

During oral argument, Zions responded to New United's contention that the 1967 lease was nonexistent by asserting that the 1974 lease did little more than substitute Old United for Spa Health Clubs, Inc. as the named lessee of the premises. Thus, Zions argued that the 1974 lease did not supersede the 1967 lease, but rather amended it in immaterial respect. Accordingly, in Zions' view, the only true and valid lease is the 1967 lease agreement as "clarified" by the 1974 "lease."

I cannot accept Zions' interpretation of the 1974 lease agreement as a clarifying amendment of the 1967 lease. In construing the 1974 lease, I must look to the objective intent of Old United and City Line, the parties to that agreement. It is apparent that, as between the parties thereto, the 1974 lease was intended to supersede the earlier lease. The 1974 agreement comprehensively addresses all material aspects of the lease arrangement, not just the names of parties. In addition, the 1974 lease contains an integration clause. Under these circumstances, it would be unreasonable to conclude, as Zions suggests, that the parties drafted the 1974 lease with the sole intent of amending the 1967 lease to reflect a change of lessee.

Alternatively, Zions argues that, at least in dealings among themselves and third

parties, Old United and New United have treated the 1967 lease agreement as if it were the valid and subsisting lease of the premises. In other words, Zions contends that by their conduct, Old United and New United have represented that the 1967 lease had legal validity. Zions bases its argument on the following circumstances, all of which are in accord with my findings of fact. In June 1976, Zions received from Old United a leasehold mortgage of the latter's interest under the 1967 lease, not the 1974 lease. Old United intended that this mortgage agreement would give Zions a valid legal security interest in the premises. When Old United on July 1, 1977 sold the spa assets to New United, it included its rights under the 1967 lease, not the 1974 lease. Old United intended that sale to be a valid transaction, supported by full consideration, to enable it to sever all ties between FEA and the spa and protect the assets from the claims of FEA's creditors. As security for payment of $480,000 of the $750,000 purchase price, Old United accepted mortgages from New United of the latter's interest under the 1967 lease, not the 1974 lease. The 1974 lease was assigned to New United in December 1977, six months *after* New United entered into possession of the premises under the 1967 lease. Further, New United undertook operation of the spa facilities with complete knowledge of the foregoing facts, and of Zions' asserted lien on the premises.

In response to Zions' contention that it has a legally enforceable mortgage, New United asserts that Zions has offered no legal basis to support its position. While New United may be correct in its observation that no articulable legal arguments are set forth in Zions' memorandum of law, the factual circumstances which Zions has highlighted for the court do suggest a basis for upholding the validity of the mortgage. Apparently Zions contends that, by their conduct, Old United and New United ratified the legal existence of the 1967 lease— and *a fortiori*, the validity of Zions' mortgage—or that they should be estopped from denying that the 1967 lease is the controlling lease of the premises.

The troubling aspect of Zions' argument is that this court cannot declare that the 1967 lease is the only true and valid lease of the premises. To do so would impair the rights of City Line, the lessor of the premises, which is not a party to this lawsuit. However, I am not persuaded by New United's logic that the validity of Zions' mortgage depends solely on the validity of the 1967 lease. At first blush, New United's reasoning seems technically plausible, but little further reflection is needed to realize that New United should not be permitted to raise the rights of the lessor as a defense to Zions' mortgage. I simply cannot and will not close my eyes to the fact that when it was to their advantage Old United and New United treated the 1967 lease as capable of securing corporate indebtedness. Now that their conduct has proven to their disadvantage, they cannot disavow their actions by relying on legal formalisms of real property law which they themselves have so patently and consciously ignored.

Without question, Old United openly disregarded the distinction between the two leases when it gave Zions a mortgage on the 1967 leasehold. Old United further disregarded this distinction when it assigned the 1967 lease to New United and accepted mortgages thereon. What I find difficult to understand is why so little evidence was presented which would explain why these transactions were conducted in this manner. Nevertheless, all of the evidence that was introduced points to the same motivating factor: Old United wanted to prevent the Germantown Savings Bank (GSB) from discovering that City Line had let the premises to Old United without obtaining GSB's consent. Thus, Old United held itself out to Zions as possessing the premises pursuant to the 1967 lease agreement. This explains why Old United's attorney drafted Zions' mortgage with reference to the 1967 lease, rather than the 1974 lease. This also explains why Old United assigned the 1967 lease, instead of the 1974 lease, to New United on July 1, 1977. Old United intended both of these transactions to have binding legal effect. Indeed, Schoonmaker tes-

tified that it was intended from the outset that Zions' mortgage would be a valid lien on Old United's leasehold. Having held the 1967 lease out as the subsisting lease of the premises, Old United, were it still in possession of the premises, could not raise the nonexistence of the 1967 lease as a defense to Zions' mortgage.

Obviously, if Old United could not raise the nonexistence of the 1967 lease as a defense to Zions' mortgage, its assignee with knowledge is equally barred. Thus New United is likewise in no position to challenge the validity of the mortgage. Concededly there is no basis for finding that Old United and New United are alter egos of one another, but New United cannot claim total innocence in this case either. New United had actual knowledge of Zions' mortgage on the 1967 leasehold estate, and it accepted an assignment of that same leasehold with knowledge that Zions' outstanding mortgage had not been satisfied. Accordingly, New United cannot persuasively contend that its title is free and clear of Zions' mortgage when the title conveyed to it by Old United on July 1, 1977 was so obviously encumbered. Nor could New United improve its position by accepting assignment of the 1974 lease six months later. Although New United suggests that the December 1977 assignment of the 1974 lease had some kind of cathartic effect, it could not wash away the knowledge which New United possessed the previous July. New United stands in the same position as Old United.

One clarifying point is necessary. I have held that New United may not defend against Zions' foreclosure claim by raising the invalidity of the 1967 lease. I emphasize, however, that no opinion is offered as to what a prospective purchaser would be willing to pay for the 1967 leasehold at a foreclosure sale. Indeed, in light of the fact that the recorded 1974 lease puts the world on notice that the lessor has granted a superseding lease of the premises, the market value of Zions' interest in the 1967 leasehold is at best questionable and at worst worthless. But since my determination that Zions may foreclose on the 1967 leasehold does not turn on whether Zions' mortgage has market value, no finding on that matter is necessary.

### B. New United's Claim for Defamation of Credit and Interference with Business Opportunities

Between February and September 1978, there were four telephone discussions between Zions and Provident National Bank (Provident) concerning the affairs of FEA, Lee Schoonmaker and New United. Two of these communications, including the first telephone call on February 15, 1978, were initiated by employees of Provident. New United contends that Zions' sole purpose in communicating with Provident was not to exchange credit information about a "mutual customer," since New United was not a customer of Zions, but rather to induce Provident to pressure Schoonmaker to repay FEA's loan from Zions. New United further contends that, as a proximate result of these discussions, Provident refused to lend $75,000 to New United in 1979. Thus, in count II of its amended complaint in C.A. 80–3283, New United seeks damages from Zions under the theories of defamation of credit and interference with prospective business opportunities. My factual findings, however, do not support the imposition of liability under either theory.

First, as to New United's defamation of credit claim, Zions has a complete defense, since all of the information given to Provident by Zions was truthful and accurate (Finding 74). See 42 Pa.Cons.Stat. Ann. § 8343. Moreover, applying the standard set forth in Altoona Clay Products, Inc. v. Dun & Bradstreet, Inc., 367 F.2d 625 (3d Cir. 1966), I conclude that the information given to Provident by Zions was privileged. New United has failed to prove abuse of the privilege. See 42 Pa.Cons. Stat.Ann. § 8343(b). Zions was not motivated by a desire to harm New United in any way. Rather, Zions was genuinely interested in exchanging credit information with Provident (Findings 70–73). This exchange of information was to the mutual

advantage of itself and Provident. Indeed, it was Provident that initiated the discussions with Zions (*see* Finding 69).

■ Apart from the merits of New United's defamation of credit claim, I also conclude that the defamation claim is time-barred. The last communication between Provident and Zions occurred on September 20, 1978 (Finding 73). New United filed its original complaint, which did not contain the defamation of credit claim, on June 20, 1980. It was not until August 4, 1981, that New United amended its complaint in C.A. 80–3283 to add the claim for defamation of credit (Finding 80). Even assuming that New United's claim in the amended complaint relates back to June 20, 1980, the date of the original pleading, *see* F.R.Civ.P. 15(c), it would still be barred by Pennsylvania's one-year statute of limitations. 42 Pa.Cons.Stat.Ann. § 5523.

■ New United's claim for damages under the theory of interference with prospective business opportunities is equally devoid of factual support. First, I note that this theory is mislabelled. More properly known as the intentional interference with prospective contractual relation, the theory advanced by New United is modelled after the *Restatement (Second) of Torts*, § 766B, and consists of four elements:

(1) a prospective contractual relation;
(2) the purpose or intent to harm the plaintiff by preventing the relation from occurring;
(3) the absence of privilege or justification on the part of the defendant; and
(4) the occasioning of actual damage resulting from defendant's conduct.

*Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d 466, 471 (1979).

Even assuming that New United has shown it had a prospective contractual relation with Provident, it has not established the remaining three elements of its cause of action. Zions' purpose in communicating with Provident was not to harm New United, but to exchange credit information. Considering all of the circumstances, I conclude that Zions did not act improperly in

contacting Provident. *See Adler, Barish, Daniels, Levin and Creskoff v. Epstein*, 482 Pa. 416, 393 A.2d 1175, 1183–84 (1978). Moreover, there has been no showing that Provident's refusal to extend credit to New United in 1979 is attributable to Zions' discussions with Provident. Indeed, the facts show that two other banks also refused to lend money to New United in 1979. New United has offered no explanation for these other denials of credit. The mere fact that New United had timely repaid an earlier loan from Provident is totally inadequate to support a finding that, but for Zions' discussions with Provident, Provident would have agreed to lend additional funds to New United in 1979.

## CONCLUSIONS OF LAW

1. This court has subject matter jurisdiction in C.A. 80–2060 by reason of diversity of citizenship, 28 U.S.C. §§ 1332, 1348.

2. This court has subject matter jurisdiction in C.A. 80–3283 pursuant to 28 U.S.C. § 1441(a).

3. FEA and Old United are in default on the March 28, 1978 promissory note given by them to Zions.

4. New United was not a party to the March 28, 1978 promissory note and is not liable to Zions on either the note or the obligation underlying it.

5. The leasehold mortgage dated June 21, 1976 from Old United to Zions is supported by consideration.

6. New United is estopped from raising the invalidity of the 1967 lease as a defense to Zions' mortgage.

7. Zions is entitled to judgment in its favor against FEA and Old United in C.A. 80–2060 in the total amount of $293,685.20, consisting of the principal amount of $225,000, interest in the amount of $57,435.20 (which includes $48,562.05 in accrued interest to October 13, 1981, the date of trial, plus interest at $62.05 per day thereafter), and attorney's fee of $11,250.

8. Zions is entitled to judgment of foreclosure and sale of the 1967 leasehold estate presently held by New United, the proceeds

of such sale to be applied to the judgment of $293,685.20 entered against FEA and Old United (including attorney's fee of $11,250).

9. Zions is entitled to judgment in its favor on Count I of New United's complaint in C.A. 80–3283 (the quiet title claim seeking to strike Zions' mortgage from the records of the Recorder of Deeds of Philadelphia County).

10. Zions' discussions with Provident National Bank relating to the financial affairs of FEA, Old United and Lee Schoonmaker were privileged.

11. New United has not established by a preponderance of the evidence that Zions abused the privilege.

12. New United has not established by a preponderance of the evidence that Zions' cither defamed its creditworthiness or intentionally interfered with any prospective contractual relationship between itself and Provident National Bank.

13. New United's defamation of credit claim is barred by the statute of limitations.[3]

14. Zions is entitled to judgment in its favor on Count II of New United's complaint in C.A. 80–3283 (the defamation of credit and interference with prospective contractual relationship claims).

ORDER

This 5th day of March, 1982, it is

ORDERED in C.A. 80–2060 that: (a) Judgment in the amount of $293,685.20, is entered in favor of plaintiff, Zions First National Bank, N/A, against defendants, Financial Enterprises of America, Inc. and CHU Liquidating Corp. (formerly United Health Clubs, Inc.), and (b) Judgment of Foreclosure Sale of the 1967 leasehold estate presently held by defendant United Health Clubs, Inc. (formerly UHC, Inc.) is entered in favor of plaintiff, Zions First

National Bank, N/A, the proceeds of such sale to be applied to the mortgage debt of $293,685.20 owing to Zions (including attorney's fee of $11,250). It is

FURTHER ORDERED that Judgment in C.A. 80–3283 is entered in favor of defendant, Zions First National Bank, N/A.

---

3. On August 4, 1981, I permitted New United to amend its complaint in C.A. 80–3283 to add its cause of action for defamation of credit. At that time, I did not require that Zions file a responsive pleading to the amended complaint. In its opposition papers to New United's motion to amend, Zions did contend that the defamation of credit claim was untimely. Therefore, although Zions did not raise the statute of limitations as an affirmative defense in the manner required by Fed.R.Civ.P. 8(c), it nevertheless put New United on notice of its intention to raise the defense.