CONTINENTAL BANK OF PENNSYLVANIA, PLAINTIFF-APPELLANT, v. BARCLAY RIDING ACADEMY, INC., NOW KNOWN AS BARCLAY EQUESTRIAN CENTER, INC., A NEW JERSEY CORPORATION, DEFENDANT-RESPONDENT.

Argued January 24, 1983—Decided May 9, 1983.

*George F. Kugler, Jr.,* argued the cause for appellant (*Archer & Greiner,* attorneys; *Morton Newman* and *William E. Taylor, III,* members of the Pennsylvania bar, and *Stephen M. Orlofsky,* of counsel).

*W. Barry Rank* argued the cause for respondent (*Weston, Kravitz & Rank,* attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

This is an action to foreclose a mortgage given by Barclay Riding Academy, Inc. ("Barclay")[1] to Continental Bank of Pennsylvania ("Continental"). At issue is whether the mortgage is void because (1) it violates the anti-tying provisions of Section 1972(1)(C) of the Bank Holding Company Act, 12 *U.S.C.* §§ 1971–1978, as amended (the "Act"); (2) it was given without consideration; or (3) it was executed under duress.

The trial court invalidated the mortgage for all three reasons, any one of which alone is sufficient to void the mortgage. The Appellate Division affirmed the trial court in an unreported *per curiam* opinion, and we granted Continental's petition for certification. 91 *N.J.* 254 (1982).

We conclude that the mortgage is valid, and reverse the judgment of the Appellate Division.

---

[1]Defendant is now known as Barclay Equestrian Center, Inc.

## I.

The initial question before us is whether Continental, by requiring the Barclay mortgage, engaged in appropriate banking practices in seeking additional protection for its substantial loans to Shulman Transport Enterprises, Inc. ("STE") and Martin Shulman ("Martin"). The answer to this question requires an examination of the financial transactions and interrelationships over the years among Continental, STE, Martin, and Martin's brother Harry Shulman ("Harry").

For many years prior to 1978, Continental served as the main bank for STE, a publicly held company engaged in the transportation business. During that time, Continental also performed banking services for Martin and Harry Shulman, who were the founders, controlling shareholders, officers, and directors of STE. Martin was the Chairman of the Board of Directors of STE and its Chief Executive Officer. Martin also was the sole stockholder of Barclay, the named defendant in this action.

Until 1976, STE had been a very profitable corporation and had maintained a regular line of credit with Continental on an unsecured basis. In 1976, STE began to suffer serious financial reverses. These reverses created the need for significantly greater corporate borrowing. In March 1977, STE and Continental entered into a secured loan agreement by which Continental extended to STE a 2-year $6,500,000 line of credit, secured by all the accounts receivable and certain other assets belonging to STE. Within three months STE required additional financing. Accordingly, Continental increased the line of credit and received additional security.

The financial fortunes of STE continued to deteriorate during 1977. By January 1978, STE's independent auditors had concluded that they would be unable to report STE as a going concern unless the corporation received a major infusion of working capital. The Shulmans approached Continental in February 1978 and requested an additional loan. Continental refused to advance more funds unless STE obtained substantial capital from another source. STE then requested a $1.5 million loan from its largest creditor, American Airlines ("American").

Continental agreed that if STE obtained a loan from American, it would permit STE to release certain assets to American as security.[2] However, for reasons not relevant here, American was unable to make the loan.

Determined to save STE, the Shulmans arranged a meeting for March 30, 1978 between themselves, their counsel, and representatives of Continental. At this meeting, the Shulmans asked Continental if it would be willing to extend to STE an additional $1,000,000 line of credit if the Shulmans would invest $1,300,000 of their own funds in STE. The Shulmans had initially proposed that they would loan their money directly to STE and receive the same security that American would have received under the initial plan. Continental did not consent to a release of any security to the Shulmans. Instead, Continental suggested that the Shulmans advance their funds to Continental and accept a junior participation in Continental's existing and additional loans to STE. Continental alleges that it urged this arrangement in order to give the Shulmans more protection than they would have received as general unsecured creditors of STE. The Shulmans accepted this arrangement, and a second Amended Loan Agreement and a Junior Participation Agreement ("JPA") were executed. Under the JPA, the Shulmans' loans were subordinated to all of STE's then-outstanding loans due to Continental as well as all future advances Continental would make to STE.[3]

Since 1972, Martin had outstanding a $185,000 personal loan from Continental, which the bank maintained in exchange for

[2]The original loan agreement required STE to obtain Continental's consent to any encumbrance upon its assets.

[3]Barclay originally counterclaimed in this action for treble damages and attorneys' fees based on alleged violations of the Bank Holding Company Act and for additional damages due to fraud and misrepresentation. After Barclay withdrew these counterclaims, STE and the Shulmans raised those issues against Continental in a suit instituted in the United States District Court for the Eastern District of Pennsylvania. In that action, Continental obtained a partial summary judgment that the junior participation agreement did not violate the Act. *Shulman v. Continental Bank,* 513 *F.Supp.* 979 (E.D.Pa. 1981).

Martin's personal note executed every six months.[4] This note, which Continental concedes was originally unsecured, had been routinely renewed every six months. The record establishes that the renewal note in existence at the time of the March 1978 meeting was not due until June 6, 1978. Further, it is uncontroverted that this note was not in default at the time of said meeting.

Since 1974, Martin also had maintained a $350,000 Certificate of Deposit ("C.D.") with Continental. This C.D. was never formally pledged as security for Martin's original $185,000 note. However, we find it reasonable to infer that Continental considered the C.D.'s existence in its periodic decisions to renew Martin's note. The C.D. represented Martin's major liquid asset. During the course of the March 30, 1978 meeting, it became evident to all parties that Martin would need to redeem the C.D. in order to advance funds to Continental for STE under the JPA.

At some point during the March 30th meeting, the Chairman of Continental, Roy Peraino, requested a private conference with Martin. In that conference, Peraino advised Martin that in view of Martin's proposed redemption of his C.D., Continental would require additional security for its own investment in the Shulmans' financial undertakings. Specifically, Continental wanted Martin to arrange a mortgage on farm property owned by Barclay, a corporation of which Martin was sole shareholder. This mortgage would secure, in particular, Martin's theretofore

---

[4]Unfortunately, the note in existence in March 1978 was not admitted into evidence below. It is therefore uncertain whether that note could be called upon demand by Continental. Significantly, the renewal note executed on June 6, 1978, which does appear in the record, was clearly a demand note secured by collateral including all "tangible and intangible property of the borrower [Martin Shulman] which the Bank [Continental] may now or hereafter have in its possession or control." We find that the terms of the June 1978 note and other record evidence support the inference that the note outstanding as of March 1978 was a demand note. However, for reasons stated *infra* at 173–74, this inference is not essential to our finding of consideration here.

unsecured $185,000 note, which was scheduled for renewal in June 1978. The mortgage would also serve as further protection for Continental's $1 million extension of credit to STE then under discussion. In order to prevent Martin from incurring any penalty for the premature redemption of the C.D., Continental also arranged to give him a two-week "bridge loan" of $350,000.

Martin agreed to Continental's request for the mortgage on the Barclay property. Within days, the requisite agreements were drafted and executed. Acting as its sole stockholder, Martin caused Barclay to execute and deliver to Continental a bond and warrant, a mortgage, and a power to pledge. Barclay also adopted a corporate resolution, acknowledging the transaction as being in its corporate interest and authorizing Martin to take the necessary steps to consummate the transaction. The mortgage was properly recorded. Continental, meanwhile, renewed Martin's personal note on June 6, 1978. The bridge loan was also executed as promised.

Despite all these efforts, STE failed. On August 2, 1978, it filed for bankruptcy under Chapter XI of the Bankruptcy Code of 1978, 11 *U.S.C.* §§ 1101–1174. When Martin's personal loan came due, he defaulted, and Continental initiated this foreclosure action.

## II.

The court below agreed with Barclay's allegation that Continental violated the anti-tying provisions of the Act when, as a condition to its agreement to provide more funds to STE, it required the Barclay mortgage as security for Martin's previously unsecured loan.[5] We disagree. The legislative history of the

---

[5]Although the federal district courts are vested with jurisdiction to entertain § 1972 suits under 12 *U.S.C.* § 1973, a mortgagor injured by a prohibited practice under § 1972 can assert a violation of the provision as a valid defense in a state mortgage foreclosure action. *See Kaiser Steel Corporation v. Mullins*, 455 *U.S.* 72, 81 n. 7, 102 *S.Ct.* 851, 858 n. 7, 70 *L.Ed.*2d 833, 842 n.

Act and the cases decided thereunder establish that this transaction is not prohibited by the Act. The relevant amendment provides in part:

(1) A bank[6] shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement—

(C) that the customer provide some additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan, discount, deposit, or trust service; [12 *U.S.C.* § 1972(1)(C)]

The legislative history of the 1970 Amendments to the Act ("the Amendments") reveals that they were enacted to provide specific legislative assurance that a bank would not use its economic power to reduce competition. The Amendments were not intended to interfere with appropriate and traditional practices used by a bank to protect its investments. This is reflected in the 1970 Senate Committee Report relating to the Amendments:

The purpose of this provision is to prohibit anti-competitive practices which require bank customers to accept or provide some other service or product or refrain from dealing with other parties in order to obtain the bank product or service they desire.

\* \* \* \* \* \* \* \*

The committee does not intend, however, that the provision interfere with the conduct of appropriate traditional banking practices. [S.Rep. No. 1084, 91st Cong., 2d Sess. (1970) reprinted in [1970] U.S.Code Cong. & Ad.News 5519, 5535–36]

■ Although there is no comprehensive list of services that Congress intended to exempt from § 1972, several types of transactions specifically were cited in the Congressional debates as illustrative of appropriate and traditional banking services. We find the following excerpt of the Senate Floor debates particularly significant:

---

7 (1982); *Associated East Mortgage Co. v. Young*, 163 *N.J.Super.* 315 (Ch. Div.1978).

6 A "bank" for purposes of § 1972 includes both state and federally chartered banks. 12 *U.S.C.* § 1841(c).

Bank loans are usually made on the basis of a careful analysis of the would-be borrower's financial position, including his assets, liabilities, income, expenses, cash flow, et cetera. It is customary, especially where a borrower is borrowing up to the limit of his ability to pay, to require that during the term of the loan he should not borrow or pledge his assets elsewhere. Such an arrangement is clearly required as a matter of sound banking. [116 *Cong.Rec.* 32125 (1970) (Statement of Sen. Bennett)]

We conclude from the legislative history that appropriate and traditional transactions engaged in by a bank to protect its investments do not violate the Act. This conclusion has been confirmed by recent decisions of the federal courts.

The Court of Appeals for the First Circuit in *B.C. Recreational Indus. v. First Nat'l Bank of Boston,* 639 *F.*2d 828 (1981), ruled that a bank did not violate the Act by demanding that its debtor in a precarious financial condition employ a full-time business advisor designated by the bank. The court found that the arrangement was not a tie-in, and, further, that "in any event, the arrangement complained of falls within the range of appropriate traditional banking practices permissible under the Act." *Id.* at 832.

The Court of Appeals for the Seventh Circuit in *McCoy v. Franklin Savings Ass'n & Mortgage Management Co.,* 636 *F.*2d 172, 175 (1980), upheld a trial court's ruling that "the practice of conditioning mortgage loan commitments upon completion of improvements to the mortgaged property is 'a traditional banking practice founded on genuine business need' and therefore exempt from the prohibitions of Section 1972[.]" In *McCoy,* as here, the plaintiff alleged that the bank unilaterally varied the terms of the parties' loan agreement by requiring, in its second commitment letter, completion of major improvements not previously requested in its first commitment letter. The court further stated:

Section 1972, however, is not concerned with modifications of the conditions of a loan agreement. It is concerned with the kind of conditions required, regardless of when they are imposed. The conditions imposed in both the first and second commitment letters are "related to and usually provided in connection with a loan" and therefore, as plaintiffs concede with respect to the first commitment letter, are not prohibited conditions under Section 1972. [636 *F.*2d at 175]

*See also Tose v. First Pennsylvania Bank, N.A.,* 648 *F.*2d 879 (3d Cir.), *cert.* denied, 454 *U.S.* 893, 102 *S.Ct.* 390, 70 *L.Ed.*2d 208 (1981) (not a violation of Section 1972 for a bank to condition loan to football team on requirement that owner relinquish his financial control to a responsible official designated by bank); *Clark v. United States,* 480 *F.*2d 235, 238 (10th Cir.), *cert.* denied, 414 *U.S.* 1004, 94 *S.Ct.* 360, 38 *L.Ed.*2d 240 (1973) (approving bank's requirement that loan applicant maintain certain amount on deposit to secure proposed loan).

The gist of these federal cases was aptly summarized in *Sterling Coal Co. v. United American Bank,* 470 *F.Supp.* 964 (E.D.Tenn.1979). In *Sterling,* the court reviewed circumstances in which a bank had conditioned its extension of credit to a new closely-held corporation upon the imposition of substantial financial controls over the corporation and had required the corporation to guarantee the existing personal loans of its two sole stockholders. The court granted the bank summary judgment on the borrower's claim that the loan requirements violated § 1972, stating:

The Act does not prohibit attempts by banks to protect their investments. These requirements, as demonstrated by this record, clearly were connected to the loans provided by the defendant. [470 *F.Supp.* at 965]

*Accord Dannhausen v. First Nat'l Bank,* 538 *F.Supp.* 551, 563 (E.D.Wis.1982); *Nesglo, Inc. v. Chase Manhattan Bank, N.A.,* 506 *F.Supp.* 254, 264 (D.P.R.1980).

The federal courts also have specifically addressed defendant's argument that Continental's requirement of the Barclay mortgage was not exempt from the provisions of § 1972 since it was an "unusual" banking practice. The courts generally hold that the mere fact that a requirement imposed by a lender to protect its investment is an uncommon or unusual banking practice is not sufficient to constitute a violation of the Act. For example, the Court of Appeals for the Eleventh Circuit, in *Parsons Steel, Inc. v. First Alabama Bank,* 679 *F.*2d 242 (1982), held that a bank did not violate the Act by conditioning extensions of credit to a financially-ailing subsidiary corporation of its customer on a

change in corporate management and majority stock ownership, even though those conditions may have been "unusual." The court observed:

> The plaintiffs were able to establish only that the requirement allegedly imposed upon them was an *unusual* banking practice. But to establish a violation of § 1972, *the "unusual banking practice" must be shown to be a tying arrangement.* The plaintiffs must prove the existence of anti-competitive practices which require bank customers to accept . . . some other service or product . . . in order to obtain the bank product or service they desire. [1970] U.S.Code Cong. & Ad.News at 5535. [679 *F.2d* at 246 (emphasis added)]

Similarly, in *Freidco of Wilmington, Ltd. v. Farmers Bank,* 499 *F.Supp.* 995 (D.Del.1980), the district court ruled, as in *Parsons,* that the mere fact that a condition required by a bank is unusual is not sufficient to constitute a violation of the Act. In *Freidco,* the alleged violation of the Act concerned conditions imposed on the repayment of a loan. The plaintiffs asserted that the arrangement was unusual. The district court ruled that uncommon requirements in a loan agreement did not constitute a *per se* violation of the Act, noting that

> it seems clear that Congress did not intend to "federalize" large segments of existing commercial and banking law, or to impose treble damage liability whenever a . . . court might conclude that the specific terms of a loan transaction were onerous or uncommon for some other reason. [499 *F.Supp.* at 1001]

As support for its position that the transaction constitutes a prohibited tie-in, Barclay relies upon *Swerdloff v. Miami Nat'l Bank,* 584 *F.2d* 54 (5th Cir.1978), and *Costner v. Blount Nat'l Bank,* 578 *F.2d* 1192 (6th Cir.1978). These two cases are clearly distinguishable from the one before us. In those cases, the prohibited transaction was anti-competitive and principally designed to enhance the bank's own market power.

In *Swerdloff,* a bank required the owners of an indebted corporation to sell 51% of its stock to a competitor which was also a customer of the bank. The Fifth Circuit held that where a bank conditioned further grants of credit on the requirement that the business be sold, "a benefit to the bank will be implied" for the purpose of a motion on the pleadings. 584 *F.2d* at 59. Thus, the court reinstated a complaint that had been dismissed on the pleadings by the district court. We find the court's

reference to a "benefit to the bank" important. The proscribed benefit is one which results not from the legitimate protection of an investment, but from a "misuse of the economic power of a bank." *Id.*

This distinction between anti-competitive benefits and the ordinary benefits derived from the protection of a bank's security in a customer loan is equally relevant to *Costner.* In that case a bank required, as a condition to the plaintiff's loan to finance a stock purchase in an automobile dealership, that a substantial share of the dealership's commercial installment paper be sold to the bank. 578 *F.*2d at 1194. Although this tying arrangement benefited the bank, it clearly did not protect the bank's investment. In fact, it was a major reason for the decline of the plaintiff's business. Thus, the violation of the Act in *Costner* resulted from the finding of a benefit entirely unrelated to the bank's security as a lender.

■ Accordingly, we adopt the sound reasoning in *Parsons* and *Freidco* and hold that even unusual or uncommon bank practices that are related to the bank's security as a lender do not violate the Act. Further, even if uncommon practices are not directly related to a bank's investment, they are violative of the Act only if they are anti-competitive. We thus examine the facts at bar in light of these principles.

■ We find that based on what Continental knew about the financial affairs of STE and Martin, its requirement of the mortgage constituted an appropriate banking practice to protect its investment. Continental knew that STE, previously a successful though heavily-indebted company, was in dire financial circumstances. The bank had serious doubts that STE could be saved even with an infusion of capital, a doubt that unfortunately proved true. Continental also undoubtedly knew that Martin's planned use of his C.D. to bail out STE placed his outstanding personal loan of $185,000 at substantial risk. Once Martin redeemed the C.D., his major liquid asset, he would have few remaining assets with which to repay his loan. There is no

legal prohibition against a bank's protecting its investment by requesting additional collateral as security for a loan. Indeed, requiring a mortgage as additional security for an outstanding loan is a traditional bank practice.[7]

This case is representative of bailout situations in which debtors in serious financial straits, working with their creditors, enter into numerous types of transactions that protect the creditors' investments while permitting the debtors' businesses to continue. The complexity of the transactions and special needs of the parties involved determine the type of arrangement that will be made to secure the joint aims of the debtor and the creditor. Due to the complicated circumstances of many bailout cases, the specific banking transactions utilized may appear uncommon, yet, in the milieu of bailouts, they constitute appropriate banking practices. As such, they do not violate the Act.

 ■ Further, we find that the practices engaged in by Continental here were not proven to be anti-competitive.[8] The asserted linkage between Continental's extension of credit to STE and the Barclay mortgage was not an attempt by the bank to corner the lending market. There is nothing that Continental desired more than for STE to obtain additional credit from some other financial institutions. Only after the Shulmans were unable to secure such outside funding did Continental request the Barclay mortgage. In short, the record establishes that the bank acted not as a market predator, but as a lender of last resort.

---

[7]See discussion of consideration, *infra*, at 169–75.

[8]In its opinion holding that the Barclay mortgage violated the Act, the trial court made absolutely no finding of any anti-competitive effects generated by the transaction. This omission was no doubt the result of Barclay's failure to proffer any such evidence at trial. One of Barclay's five financial experts did briefly state that the overall transaction involving the STE loan and the Barclay mortgage was "reciprocal in nature." He offered no proof, however, that this alleged reciprocity produced adverse market consequences.

We conclude, therefore, that under the Act, Continental's requirement of the Barclay mortgage is not a prohibited transaction, and accordingly the mortgage is not void.

### III.

Barclay further alleges that its mortgage is void because it was given without consideration. The trial court agreed that consideration was lacking, principally because Barclay's mortgage secured a pre-existing personal note that was not in default at the time of the March 30 agreement. We find that conclusion contrary to traditional applications of the doctrine of consideration.

As a preliminary matter, we note that Barclay has standing to allege lack of consideration as a defense to this foreclosure action. Barclay's corporate approval of the mortgage does not estop it from now objecting to the bank's alleged failure to provide consideration. We are aware of dictum seemingly contrary to this proposition in *Roxbury State Bank v. The Clarendon,* 129 *N.J.Super.* 358, 370 (App.Div.), certif. den., 66 *N.J.* 316 (1974), but find it inapposite. In noting in *Roxbury* that a corporation may be estopped from later challenging certain agreements it makes for the benefit of favored officers or shareholders, Judge Conford alluded generally to cases in which the corporation had sought to rescind the transactions because of its own failure to observe legal formalities. *See, e.g., N.J. Car Spring and Rubber Co. v. Fields,* 85 *N.J.L.* 217 (E. & A.1913); *Breslin v. Fries-Breslin Co.,* 70 *N.J.L.* 274 (E. & A.1904). By contrast, the mortgage in this case was duly executed after a proper corporate resolution authorizing its issuance. Barclay's challenge goes to the substance of the transaction, not its form. The trial court was free to consider that challenge, notwithstanding Barclay's initial assent to the deal. *Cf. Levine v. Blumenthal,* 117 *N.J.L.* 23 (Sup.Ct.1936), aff'd, 117 *N.J.L.* 426 (E. & A.1937) (invalidating, for want of consideration, mutual agreement to reduce rent in spite of

landlord's assent to the reduction). We accordingly review the disposition of that challenge here.

No contract is enforceable, of course, without the flow of consideration—both sides must "get something" out of the exchange. *Friedman v. Tappan Development Corp.*, 22 *N.J.* 523, 533 (1956); 1 A. Corbin, *Contracts* § 110 (1963 ed.). "Consideration is the price bargained for and paid for a promise." *Friedman*, 22 *N.J.* at 535. Valuable consideration may take the form of either a detriment incurred by the promisee or a benefit received by the promisor. *Novack v. Cities Serv. Oil Co.*, 149 *N.J.Super.* 542, 549 (Law Div.1977), aff'd, 159 *N.J.Super.* 400 (App.Div.), certif. den., 78 *N.J.* 396 (1978); 1 *Corbin, supra,* §§ 121–122. In seeking to invalidate the mortgage on consideration grounds, Barclay has the burden of establishing that it failed to receive any bargained-for benefit from Continental and, further, that Continental did not incur any detriment at Barclay's request. *Wilson v. Stevens,* 105 *N.J.Eq.* 377, 383 (Ch.1929). The mortgage is presumed to be supported by consideration "in the absence of clear and convincing evidence to the contrary." *Federal Beneficial Ass'n v. Eastern Land Co.,* 96 *N.J.Eq.* 628, 631 (E. & A.1924).

Sometimes it is stated that a mortgage, as an executed conveyance, requires no consideration.[9] However, that proposition is only a half-truth, for the authorities almost universally recognize that there still must be consideration for the underlying debt that the mortgage secures.[10] The debt secured may be a pre-existing one. *Collerd v. Tully,* 78 *N.J.Eq.* 557, 559 (E. &

---

[9]*E.g., Campbell v. Tompkins,* 32 *N.J.Eq.* 170 (Ch.), aff'd, 33 *N.J.Eq.* 362 (E. & A.1880); G. Osborne, *Handbook on the Law of Mortgages* § 107, at 168 (2d ed. 1970); W. Walsh, *A Treatise on Mortgages* § 14, at 75 (1934); *see also* Clapp, "Consideration Is Not Necessary for a Mortgage," 58 *N.J.L.J.* 1 (May 2, 1935).

[10]*E.g., Perkins v. Trinity Realty Corp.,* 69 *N.J.Eq.* 723, 726 (Ch.1905), aff'd, 71 *N.J.Eq.* 304 (E. & A.1906); *Osborne, supra,* at 169; 59 *C.J.S., Mortgages* § 87 (1949).

A.1911); *Poultrymen's Serv. Corp. v. Baer,* 63 *N.J.Super.* 163 (Law Div.1960); *see also O'Neill Prod. Credit Ass'n v. Mitchell,* 209 *Neb.* 206, 307 *N.W.2d* 115 (1981). *See generally Osborne, supra,* at 168; L. Jones, *A Treatise on the Law of Mortgages* § 611, at 489 (1879).

 In addition, a third party can issue an enforceable mortgage to secure another's obligation. *Federal Beneficial Ass'n, supra,* 96 *N.J.Eq.* at 630–31; *Perkins v. Trinity Realty, supra,* 69 *N.J.Eq.* at 726; *Lee v. Kirkpatrick,* 14 *N.J.Eq.* 264 (Ch.1862); *see also Seattle First Nat'l Bank v. Hart,* 19 *Wash. App.* 71, 573 *P.2d* 827 (1978). This proposition derives from the accepted principle that one may enter into a binding contract for the benefit of a third party. *Coast Nat'l Bank v. Bloom,* 113 *N.J.L.* 597, 602 (E. & A.1934); *see also* 4 *Corbin, supra,* § 774. As long as a contract is bargained for by the promisee, it is immaterial that the benefit of the exchange runs to a designated third party beneficiary. *Guaclides v. Kruse,* 67 *N.J.Super.* 348, 354 (App.Div.), certif. den., 36 *N.J.* 32 (1961). Thus, third-party beneficiary principles applicable to contracts in general are equally applicable to mortgages. *See generally Osborne, supra,* at 168; *Walsh, supra,* at 75 n. 4.

 Having established that (1) a mortgage can be given to secure a pre-existing debt and (2) one can execute a mortgage for the benefit of a third party, we now consider the effect of combining these two propositions. Specifically, under what circumstances may one execute a mortgage to secure the antecedent debt of another? In general, a "stranger to the debt" cannot issue a mortgage thereupon without the passage of new and distinct consideration. *E.g., Jones, supra,* § 615 at 491; 59 *C.J.S., supra,* § 91 at 136–37. This principle is founded upon suspicions that a third-party mortgage exacted subsequent to the creation of the debtor's liability may be prone to fraud, since the debtor's benefit will not have been bargained for by the mortgagor. However, where the third person's mortgage is offered in exchange for an additional benefit to the debtor, the

mortgage is enforceable. *Perkins v. Trinity Realty, supra,* 69 *N.J.Eq.* at 728; *Lee v. Kirkpatrick, supra,* 14 *N.J.Eq.* at 266; *see also Osborne, supra,* at 168 n. 78; *Walsh, supra,* at 75 n. 4. For instance, it has long been accepted that an individual may execute a mortgage to secure pre-existing liabilities of his or her spouse.[11]

Only a minimal, often intangible, benefit need pass to satisfy the consideration requirement for third-party mortgages of existing debts. *E.g., Zions First Nat'l Bank v. United Health Clubs,* 533 *F.Supp.* 1127 (E.D.Pa.1982) (upholding subsidiary's mortgage to secure parent corporation's past debts where creditor agreed to defer collection of quarterly interest payments). The two most common forms of such consideration are (1) the creditor's forbearance in suing on an overdue debt and (2) renewal or extension of the debtor's original note. When a mortgagee forbears from exercising his right to collect another's debt, he incurs a legal detriment amounting to consideration. *Perkins v. Trinity Realty, supra,* 69 *N.J.Eq.* at 728–29. *Accord Kadish v. Kalloff,* 3 *Ariz.App.* 344, 414 *P.2d* 193 (1966); *Riddle v. LaSalle Nat'l Bank,* 34 *Ill.App.2d* 116, 180 *N.E.2d* 719 (1962); *Safety Fed. Savings & Loan Ass'n v. Thurston,* 8 *Kan.App.2d* 10, 648 *P.2d* 267 (1982); *Kessler v. Liberty Ins. Bank,* 244 *Ky.* 73, 50 *S.W.2d* 43 (Ky.App.1932). Similarly, a lender's voluntary renewal or extension of time of an outstanding loan also constitutes valid consideration for a third-party mortgage. *Lortz v. Swartfager,* 34 *Cal.Rptr.* 436, 221 *Cal.App.2d* 333 (1963) (extension of time); *State Bank v. Criswell,* 155 *Kan.* 314, 124 *P.2d* 500 (1942) (renewal note); *see also Jones, supra,* § 611 at 489; 59 *C.J.S., supra,* § 92 at 137–38.

---

[11] *E.g., Cooke v. Louisville Trust Co.,* 380 *S.W.2d* 255 (Ky.App.1964); *Kansas Manufacturing Co. v. Gandy,* 11 *Neb.* 448, 9 *N.W.* 569 (1881); *Deal v. Christenbury,* 50 *N.C.App.* 600, 274 *S.E.2d* 867 (1981); *American State Bank v. Cwach,* 85 *S.D.* 562, 187 *N.W.2d* 107 (1971).

■ In reviewing the transaction here, we find at least two separate forms of consideration supporting the Barclay mortgage. First, we find that Continental explicitly or impliedly promised in March 1978 to forbear from calling Martin's note when it became due in June. Barclay contends that the record is devoid of such evidence, claiming that Continental's previous routine practice of renewing the note on an unsecured basis made such a promise unlikely. This contention is unfounded. A prior promise to forbear from exercising a legal right may be inferred from evidence of subsequent forbearance, at least where such a promise appears reasonable under the circumstances. *Hockenbury ads. Meyers*, 34 *N.J.L.* 346, 348 (Sup.Ct.1870); *Szymanska v. Equitable Life Ins. Co.*, 37 *Del.* 272, 183 *A.* 309 (Del.Super.Ct.1936); *Merrimac Chem. Co. v. Moore*, 279 *Mass.* 147, 181 *N.E.* 219, 222 (1932); 1 *Corbin, supra*, § 137 at 589. With respect to prior debts, "the renewal of a note is in itself some evidence of forbearance." 1 *Corbin, supra*, § 213 at 241 (1982 Supp.). Here, Continental's renewal of Martin's note in June 1978 reasonably suggests a prior mutual understanding that Continental would not exercise its right to call his loan.[12] The language of Barclay's power to pledge for the June renewal note reflects such an understanding:

> In consideration of Bank [Continental] making or *continuing to make loans or otherwise becoming or continuing as a creditor* of MARTIN SHULMAN[,] (Borrower) Undersigned [Barclay], unconditionally and absolutely agree[s] and consent[s] . . . [a]s security for any and all indebtedness and/or other liabilities of Borrower to Bank now or hereafter contracted . . . Bank shall have and is hereby given a lien, encumbrance and security interest in the following property[.] [Plaintiff's Trial Exhibit P4E (emphasis added)]

■ The subsequent conduct of the parties and the language of the underlying instrument plainly indicate that all those interested in this transaction contemplated that if Martin procured the Barclay mortgage, Continental would renew his note

---

[12]Naturally, if Continental's assertion that it could have immediately called the note in March 1978 were correct, there would be no need even to imply such a prior promise of forbearance *post facto*.

when it became due. Indeed, Continental probably would have called the note had it not received such security, given the pending withdrawal of Martin's $350,000 certificate of deposit. Barclay has not presented any affirmative evidence to the contrary. Hence, we find Continental's implied promise of forbearance valid consideration for the mortgage.

■ Second, Barclay's assertion that consideration was absent here pales when the entire transaction between Continental, the Shulmans, and Barclay is considered as a whole. The trial court misconstrued the evidence in considering only Martin's personal loan as a potential source of consideration for Barclay's mortgage commitment. Viewing the transaction more broadly, we find it apparent that the Barclay mortgage was merely one of several conditions for Continental's continued and expanded financial support of the Shulmans' business ventures. The mortgage was simply part and parcel of the overall transaction. That transaction included, *inter alia,* an additional $1 million line of credit to the Shulmans, as well as the $350,000 two-week bridge loan advanced to Martin upon withdrawal of his certificate. Continental provided ample consideration for the whole transaction, of which the mortgage was simply one component.

■ We further address the argument that the mortgage was invalid because it was executed entirely for the benefit of Martin Shulman rather than Barclay, its corporate signatory. Briefly stated, the argument is that execution of the mortgage was beyond the proper exercise of Barclay's corporate powers, or "*ultra vires.*" This argument is also without merit. Corporations in this state have the general power to mortgage their properties. *N.J.S.A.* 14A:3–1(1)(e). It has long been accepted that a New Jersey corporation may issue a mortgage to secure debts other than those of the corporation itself, provided that it does not threaten the rights of other shareholders or creditors. *See Perkins v. Trinity Realty Co., supra,* 69 *N.J.Eq.* at 730–31 (validating mortgage extended by corporation to secure unrelat-

ed debts of one of its creditors). Barclay has not adduced any evidence establishing that its creditors were injured by the transaction here. And, since Martin was Barclay's sole shareholder, no other shareholders could have been harmed. *Osborn v. Montelac Pk.*, 35 *N.Y.S.* 610 (Sup.Ct.1895), aff'd, 153 *N.Y.* 672, 48 *N.E.* 1106 (1897) (upholding third-party mortgage given by corporation to secure personal debt of its president, absent objection by creditors or other stockholders). Indeed, the mortgage was ratified by a proper corporate resolution. Accordingly, we reject Barclay's claim that the transaction was beyond the authorized scope of corporate undertakings.

## IV.

Lastly, Barclay alleges that its mortgage is void because it was given under duress. Citing no authority, the trial court agreed, based upon its finding that Martin had no practical choice but to accede to Continental's demand for the mortgage. Although we do not dispute the trial court's factual findings, we disagree with its legal inference of duress from those facts.

During the last 50 years, the doctrine of economic duress has significantly developed and expanded, in recognition of the ever-increasing complexity of the business world. Several courts, including the United States Supreme Court, have recognized that there are circumstances under which economic pressure may invalidate an otherwise enforceable contract. *See* 13 S. Williston, *Contracts,* § 1603 at 664 (3d ed. 1970); *United States v. Bethlehem Steel Corp.,* 315 *U.S.* 289, 62 *S.Ct.* 581, 86 *L.Ed.* 855 (1942); *Hartsville Oil Mill v. United States,* 271 *U.S.* 43, 46 *S.Ct.* 389, 70 *L.Ed.* 822 (1926). Although the doctrine has broadened, there is still not firm agreement as to the scope of the concept of "economic duress." Through the years several definitions have evolved.

As a starting point, we refer to the following definition of economic duress set forth in *Williston:*

> While there is disagreement among the courts as to what degree of coercion is necessary to a finding of economic duress, there is general agreement as to its basic elements:
>
> 1. The party alleging economic duress must show that he has been the victim of a wrongful or unlawful act or threat, and
>
> 2. Such act or threat must be one which deprives the victim of his unfettered will. [13 *Williston, supra,* § 1617 at 704 (footnotes omitted)]

In his explanation of these elements, Williston notes that "the party threatened must be compelled to make a disproportionate exchange of values or to give up something for nothing." *Id.*

The few reported cases in New Jersey that have defined economic duress are consistent with the *Williston* formulation. This Court in *Woodside Homes, Inc. v. Morristown,* 26 *N.J.* 529, 544 (1958), stated that economic duress requires "an assent by one party to an improper or wrongful demand by another under circumstances in which the former has little choice but to accede to the demand, *i.e.,* 'to do what he otherwise would not have done.'" In rejecting a claim of economic duress in *Woodside Homes,* we relied heavily upon the fact that the pressure exerted there was not inherently wrongful. *Id.* at 545.

Several years later in *Ross Sys. v. Linden Dari-Delite, Inc.,* 35 *N.J.* 329 (1961), we described the concept of economic duress in slightly different terms. In that case, we stated, "Payments are made under duress when they are induced by the wrongful pressure of the payee and the payor has no immediate and adequate remedy in the courts to resist them." *Id.* at 335. Notwithstanding the addition of the second element (no adequate remedy) in *Ross,* the New Jersey cases other than *Ross* defining economic duress have focused primarily on the first element (wrongful pressure) in determining whether economic duress has been established. *E.g., S.S. & O. Corp. v. Bernards Sewerage Auth.,* 62 *N.J.* 369, 387 (1973) (duress established by sewerage authority's use of coercive tactics to defeat potentially valid claim by developer; availability of developer's remedy not independently considered); *S.P. Dunham & Co. v. Kudra,* 44 *N.J.Super.* 565, 570–71 (App.Div.1957) (questioning wisdom of "no remedy" requirement). We summarized the effect of this trend in *West Park Ave., Inc. v. Ocean Tp.,* 48 *N.J.* 122 (1966):

Some authorities dispute the validity of the requirement that the victim of duress show he had no feasible remedy available to him. See *S.P. Dunham & Co. v. Kudra,* 44 *N.J.Super.* 565, 570–571 (App.Div.1957). The point made is that if the payee's conduct is wrongful, nothing more should be demanded of the victim. We need not, however, say whether the criticism is correct.... *But it does seem safe to say that in evaluating the behavior of the parties, the nature and degree of wrongfulness of the payee may be the decisive factor.* [48 *N.J.* at 129 (emphasis added)]

We adhere today to our previous statement of the law of duress in *West Park Ave.*—that the "decisive factor" is the wrongfulness of the pressure exerted. The term "wrongful" in this context encompasses more than criminal or tortious acts, *Miller v. Eisele,* 111 *N.J.L.* 268, 276 (E. & A.1933), for conduct may be legal but still oppressive. As the Appellate Division rightly observed in *Wolf v. Marlton Corp.,* 57 *N.J.Super.* 278, 287 (1959), "[w]e have come to deal, in terms of the business compulsion doctrine, with acts and threats that are wrongful, not necessarily in a legal, but in a moral or equitable sense."

Each case must be examined to determine if the threatening party acted wrongfully. "The situations are so varied that one cannot be sure of a simple formula." *West Park Ave.,* 48 *N.J.* at 129. We do, however, find the following generalizations cited in *Williston* relevant:

One point has tended to become more certain: Where there is adequacy of consideration, there is generally no duress.... Whenever a party to a contract seeks the best possible terms, there can be no rescission merely upon the grounds of "driving a hard bargain." Merely taking advantage of another's financial difficulty is not duress. Rather, the person alleging financial difficulty must allege that it was contributed to or caused by the one accused of coercion.... Under this rule, the party exerting pressure is scored only for that for which he alone is responsible. [*Williston, supra,* § 1617 at 708 (footnotes omitted)]

Applying these considerations to the facts here, we conclude that Continental did not act wrongfully in requesting the Barclay mortgage. First, as noted *supra* at 169–175, there was valid consideration for the mortgage transaction. Second, Continental itself was not the cause of STE's financial woes.

The New Jersey case most similar to the one at bar is *Ewert v. Lichtman,* 141 *N.J.Eq.* 34 (Ch.Div.1947). In *Ewert,* restaurant

operators sought purchasers for the business. Because the operators held only a month-to-month lease, they also sought assurance from the landlord that he would continue to lease the premises to the prospective buyer. The landlord agreed to grant the purchaser an extended lease on the condition that the present operators pay him $1,000. The present operators then alleged that the $1,000 payment was made under duress. Holding that the payment was not made under duress, the *Ewert* court cited a number of facts militating against the duress claim: the operators were not obligated to sell the business; the landlord was not obligated to lease the premises to the buyer; the landlord put no pressure on the operators to sell; the operators were represented by counsel; the landlord was understandably skeptical of the buyer's business acumen; and, most significantly, the difficulties encountered by the operators were self-created rather than imposed by the landlord. *Id.* at 39. Taken as a whole, these factors plainly indicated that the landlord's request for the additional $1,000 was not wrongful. Hence, the operators' duress claim failed.

Like the landlord in *Ewert*, Continental was not obligated to do further business with the party claiming duress. Specifically, the bank did not have to lend STE any additional capital or to renew Martin's loan. In fact, Continental encouraged STE to seek funds from other sources. Like the operators in *Ewert*, STE's own financial predicament made such other alternatives scarce, perhaps non-existent. Nor were the financial difficulties of STE and the Shulmans the result of any act of Continental.

Continental acted properly in requesting the mortgage as security for Martin's indebtedness to the bank. Continental reasonably feared that because of STE's financial condition and Martin's attempt to bail out STE, Martin would be unable to pay his personal loan of $185,000. In requesting the Barclay mortgage, Continental did not seek to exploit the Shulmans' already-serious financial condition. Rather, it merely attempted to protect its existing substantial investment in the financial activities of the Shulmans and STE.

Both the Shulmans and Continental anticipated a benefit from the arrangement. Shulman was able to obtain the necessary funds for the Junior Participation Agreement and thereby assure that STE would receive additional capital from the bank. Continental obtained additional protection for its substantial loans to STE and Martin. The subsequent financial demise of STE and Martin should not transform these voluntarily-agreed-upon conditions into evidence of duress. As the *Ewert* court properly noted, "[t]he qualities of the bargain which the litigant once regarded as expedient and pragmatical ought not to be reprocessed by the court into actionable duress." 141 *N.J.Eq.* at 38. The maxim applies equally to this case.

In conclusion, the financial difficulties suffered by Martin Shulman and STE upon entering these arrangements do not diminish the fact that Shulman expected to benefit from the deal. Furthermore, because these financial troubles were not caused by Continental, they cannot be used as support for the duress defense. STE's inability to obtain outside capital, rather than pressure from Continental, forced STE and Shulman to accept Continental's terms. Continental's request for the mortgage simply was not wrongful.[13] We therefore reverse the lower court's unsupported finding of duress as clearly contrary to the weight of the evidence here.

## V.

To summarize, we find that, in requiring the Barclay mortgage, Continental was engaged in a sound banking transaction to protect its substantial loans to STE and Martin. We conclude the Barclay mortgage was not violative of the anti-tying provi-

---

[13]In light of our holding that Continental's conduct was not wrongful, we need not reach the delicate issue of whether Barclay's response to that conduct should be analyzed from an "objective" or a "subjective" standard. *Compare Rubenstein v. Rubenstein,* 20 *N.J.* 359, 367 (1956) (subjective standard) *with King v. Margolis,* 133 *N.J.Eq.* 61 (Ch.), aff'd, 133 *N.J.Eq.* 617 (E. & A.1943) (objective standard). We leave that doctrinal debate to another day.

sions of the Bank Holding Act, was supported by valid consideration, and was the product of arms-length bargaining rather than of economic duress. Accordingly, the judgment of the Appellate Division in favor of defendant is hereby reversed.

*For reversal*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.

*For affirmance*—None.