

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-29-2004

# A. H. Meyers Co v. CNA Ins Co

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-2592

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"A. H. Meyers Co v. CNA Ins Co" (2004). *2004 Decisions.* Paper 1061.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/1061

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 03-2592
_____

A. H. MEYERS & COMPANY,

Appellant

v.

CNA INSURANCE COMPANY; AMERICAN
CASUALTY COMPANY OF READING, PENNSYLVANIA;
CONTINENTAL CASUALTY COMPANY; TRANSCONTINENTAL
INSURANCE COMPANY; VALLEY FORGE INSURANCE COMPANY, j/s/a

_____

On Appeal From the United States District Court
For the District of New Jersey
(D.C. No. 97-cv-06107)
District Judge: Honorable Joseph H. Rodriguez
_____

Argued January 12, 2004
Before: ALITO, CHERTOFF and BECKER, *Circuit Judges.*

(Filed January 29, 2004)

STEVEN E. ANGSTREICH, ESQUIRE (Argued)
THOMAS S. HARTY, ESQUIRE
PAUL N. BONAVITA, ESQUIRE
Levy, Angstreich, Finney, Baldante, Rubenstein
& Coren, P.C.
1616 Walnut Street
Fifth Floor
Philadelphia, Pennsylvania 19103
    *Attorneys for Appellant*

MITCHELL A. LIVINGSTON, ESQUIRE (Argued)
SUSAN STRYKER, ESQUIRE
CHRISTOPHER E. TORKELSON, ESQUIRE
Sterns & Weinroth
50 West State Street
P.O. Box 1298
Trenton, New Jersey 08607-1298
        *Attorneys for Appellees*

_____

OPINION OF THE COURT
_____

BECKER, *Circuit Judge.*

This is an appeal by plaintiff A.H. Meyers & Company ("Meyers"), an insurance

agency which had entered into an agency agreement that allowed it to write policies

underwritten by defendant CNA Insurance Company ("CNA") and its affiliated

companies (also defendants), from an order of the District Court dismissing the case.

Meyers appeals several rulings by the District Court that, taken together, left it without

any colorable theory of damages. We will affirm in all respects, though on somewhat

different grounds.

I.

The case was terminated under unusual circumstances, which raise a threshold

question of our appellate jurisdiction. The District Court excluded an expert report

proffered by plaintiff computing its damages, in the absence of which plaintiff was

unwilling to go to trial because it could not recover anything. Plaintiff therefore

requested dismissal so that it could appeal. Plaintiff made clear at oral argument before

2

us that if it does not prevail on appeal there is nothing that it wishes to proceed on in the District Court. Plaintiff further represented that if it prevails here, the only claims that it will pursue in the District Court are those covered by the contested expert report. Under these circumstances, we are satisfied that the order of the District Court dismissing the case is a final order and that we have appellate jurisdiction.

## II.

## A.

Meyers is an independent agent. It writes insurance policies underwritten by various companies, but CNA accounted for about half of Meyers's business. Meyers was writing various forms of personal insurance (automobile, home, and universal security) and also commercial insurance on behalf of CNA at all relevant times. CNA had at least two types of standard-form agreements with its agents: a "standard preferred agency agreement" and a more-lucrative "high performance agency agreement" (an "HPA agreement"). Starting in 1983, CNA and Meyers entered into an HPA agreement; this was renewed at five-year intervals (i.e., in 1988 and 1993).

An important term of the HPA agreement was the "110% guarantee." This clause reads, in relevant part:

> We guarantee to provide an available market to you for a period of five years from the effective date of this Agreement for those classes of business contained in the various commission schedules attached to this Agreement, subject to the maximum limits of liability and restrictions contained in this High Performance Agency Binding Authority Schedule attached to this Agreement, our existing underwriting rules, regulations, and programs, all of the other terms and conditions of this Agreement, and the

3

terms and conditions of your Annual Market Plan and the premium volume growth plans contained therein.

For each applicable line of business, the available market guarantee for each year's market plan volume (new written premium) shall not be less than 110% of the prior year's amount of actual net written premium paid to us and contained in your Producer Experience Report for such year.

Just what the "110% guarantee" means is subject to some dispute (as the District Court acknowledged). It certainly means that something is to be larger each year than it was in the preceding year. The dispute turns on whether that "something" is the total premium volume (including renewals) or is the volume of new sales. (The latter would be better for Meyers because in 1992 it was experiencing 30%+ growth in total premium volume.) At all events, the District Court found this to be a disputed issue of contract interpretation, and declined to grant summary judgment on it. That issue, however, is not before us.

The language quoted above makes reference to an "Annual Market Plan," (an "AMP") which is the other key document defining the volume of policies that an agency under an HPA agreement could sell. The AMPs were signed by Meyers and CNA. They are in large part just columns of figures establishing how much (in number and total premium value) insurance Meyers could write on behalf of CNA in each of a number of categories. What is significant is that, for the years in question here, certain personal line categories—principally automobile and universal security—were listed at "zero," meaning that there could be no growth in the number of policies written in those categories. Moreover, each AMP has a clause immediately above the signature block that

4

reads:

> To the extent any of the provisions of this Annual Market Plan change, modify or supersede any other terms of the Agency Agreement, the provisions contained in this plan shall control as respects business written under this Plan.

We understand "the Agency Agreement" to refer to the HPA agreement that Meyers and CNA had renewed in 1993. Although no date of signing is indicated on either the HPA or any of the AMPs, both the HPA agreement renewal and the 1993 AMP are dated "effective" January 1, 1993, and subsequent AMPs are dated "effective" January 1, 1994 and 1995. Meyers for its part contends that it entered the AMPs under economic duress from CNA, averring that CNA offered the AMPs to Meyers without negotiation, and on a take-it-or-leave-it basis.

B.

The backdrop to these AMPs was the ongoing crisis in New Jersey's automobile insurance market. In the 1980s, premiums had risen so high that the State stepped in with several successive plans for insuring the vast number of effectively uninsurable motorists in the state. Insurance companies doing business in the state were, under some of these arrangements, required to underwrite automobile insurance, an exposure they desperately wanted to minimize. The dealings between CNA and Meyers that led to this suit were sharply affected, if not triggered, by these events: CNA wanted to limit Meyers's premium volume in order to limit its exposure to the New Jersey automobile insurance market.

5

Meyers remonstrates that the strictures of the AMPs were not commercially reasonable. It explains that it cannot occupy a sales force that is the bread and butter of an insurance agency if it is unable to write a new policy unless one of its existing policies has been cancelled or not renewed. We sympathize with Meyers, but view the state of affairs as one imposed on the market (and the carriers) by the New Jersey insurance laws and regulations.

## C.

Meyers filed this suit in New Jersey Superior Court in 1997, and CNA removed it to the United States District Court for the District of New Jersey. The complaint advanced six theories of recovery: (1) breach of contract; (2) breach of covenant of good faith; (3) misrepresentation; (4) violation of the New Jersey Consumer Fraud Act (CFA); (5) intentional interference with existing business relationships; and (6) intentional interference with reasonable expectation of economic benefit.

The District Court granted summary judgment to CNA on the CFA claim, holding that the CFA does not apply to this transaction. Meyers appeals this determination. The District Court refused to grant partial summary judgment to either party on the interpretation of the "110% guarantee," holding instead that its interpretation would be a jury issue. However, it went on to consider whether Meyers had, at all events, waived that guarantee by entering into the AMPs, which provided for essentially no growth. After citing a number of cases for the proposition that it is difficult, under New Jersey law, to find waiver as a matter of law (i.e., it is a question of intent, usually for the finder

6

of fact to decide), the District Court nonetheless held that Meyers had waived the "110% guarantee," whatever it really meant, by entering into the zero-growth AMPs in 1993, 1994, and 1995. In coming to this determination, the District Court also rejected as a matter of law Meyers's claim that it entered into the AMPs under duress.[1]

The case came to a head with some skirmishes about reports prepared by Meyers's expert witnesses. In brief, it appears that those expert reports ignored the District Court's holding on zero growth, and computed damages based on one interpretation or another of the "110% guarantee." The District Court struck Meyers's final expert report, and, as noted above, Meyers sought a dismissal with prejudice so that it might appeal, recognizing that it was not worth taking the case to trial without a viable damages theory. On appeal, then, Meyers challenges both the CFA ruling and the waiver ruling on which the District Court barred its expert's liability computation.

## II.

### A.

We consider the CFA claim first. The New Jersey CFA provides that the following is an unlawful business practice:

> The act, use or employment by any person of any unconscionable
> commercial practice, deception, fraud, false pretense, false promise,

---

[1]We agree with the District Court that the claim of duress is without merit, and will affirm on that issue. Any business pressures to which Meyers perhaps succumbed in entering the AMPs are a far cry from the wrongful compulsion required under New Jersey law for a finding of economic duress. *See Continental Bank v. Barclay Riding Academy, Inc.*, 459 A.2d 1163, 1174-79 (N.J. 1983).

7

> misrepresentation, or the knowing[ ] concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, *in connection with the sale or advertisement of any merchandise* or real estate . . . .

N.J. Stat. Ann. § 56:8-2 (emphasis added). This is the provision that the District Court quoted (with the same emphasis) in dismissing Meyers's CFA claim. The District Court's analysis is thorough and correct. Our precedent in *J & R Ice Cream Corp. v. California Smoothie Licensing Corp.*, 31 F.3d 1259 (3d Cir. 1994), is indistinguishable from this case, and no intervening decision from the New Jersey Supreme Court has cast doubt on the correctness of that case.

In *J & R Ice Cream*, this Court considered the applicability of the CFA to a franchise agreement, and concluded that it did not apply. The facts were a fairly typical franchising arrangement: The licensing company (the defendant) made a number of promises to the franchisee (the plaintiff) about gross sales and so on. The franchisee purchased the franchise (for a smoothie shop) and sales were not as good as promised, so the franchisee sued. The franchise agreement provided that New Jersey law would apply, and the case was tried to a jury in federal court. On appeal, this Court held that although the CFA was intended to be applied expansively, it did not apply to a franchising transaction between a franchise licensing company and a franchisee. We reached that conclusion by holding that the term "merchandise" (which is defined by the CFA to include "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale," N.J. Stat. Ann. § 56:8-1(c), does not encompass the sale

of franchises.  *J & R Ice Cream*, 31 F.3d at 1270-74.

Even without repeating the extensive analysis in *J & R Ice Cream*, it should be clear that there is no meaningful way to distinguish a franchise arrangement from an agency arrangement.  As we explained in *J & R Ice Cream*:

> [franchises] are not covered by the Consumer Fraud Act because they are businesses, not consumer goods or services.  They never are purchased for consumption.  Instead they are purchased for the present value of the cash flows they are expected to produce in the future and . . . bear no resemblance to the commodities and services listed in the statutory definition of "merchandise" or the rules promulgated by the Division of Consumer Affairs.

31 F.3d at 1274 (footnotes omitted).  The same can surely be said of insurance agency relationships.  Thus we affirm the District Court's dismissal of Meyers's CFA claim.

### B.

Meyers's second objection concerns the District Court's striking of its expert's report, a result that flowed from that Court's holding on waiver.  We find the waiver analysis unhelpful.  We view the matter as one of contract interpretation.  Looking closely at the language of the HPA agreement and the AMPs, it becomes clear that neither is a complete contract; rather, they make reference to each other:  The HPA agreement contemplates that it will be "subject to" the AMPs, and the AMPs themselves indicate that they may "change, modify or supersede . . . terms" of the HPA agreement.  Thus we must view the contract between Meyers and CNA as a two-part contract, with the HPA agreement sketching the rough outline of their long-term relationship, and the AMPs serving to fill in detailed terms of their short-term relationship.

Looked at from this point of view, we see the case as a matter of unambiguous contract interpretation: Meyers's expert reports did not conform to the allocations established in the AMPs, and we conclude that the District Court properly barred those reports. That is because the zero growth entry in the AMP plainly means what is said—zero. Plaintiff also remonstrates that the District Court's earlier conclusions about this being a jury issue—i.e., remitting to a jury the question whether the 110% guarantee referred to growth in total volume or to growth in new sales volume—are inconsistent with the Court's ultimate conclusion. That may be so, but the conclusion reached by the District Court pretermitted this jury issue and, moreover, was the right result.

To recapitulate, the AMPs knowingly executed by Meyers clearly limited it to zero growth in the years in question. Consequently, the expert report, which calculates Meyers's damages on the basis of a growth scenario, drawn from the HPA agreement without reference to the AMP, was properly excluded from evidence. Accordingly, the order of the District Court dismissing the plaintiff's action will be affirmed.

10

TO THE CLERK:

Kindly file the foregoing opinion.


/s/      Edward R. Becker
Circuit Judge