OPINION
AMBRO, Circuit Judge.
In spring 1999 Wild Waves, LLC rented approximately two-thirds of a 1.7 acre amusement “pier” (really a boardwalk) in Wildwood, New Jersey, from Nickels Midway Pier, LLC for $250,000 per year. The pier had a castle and dungeon on it; Wild Waves wanted to add a waterpark. Wild Waves claims it thought Nickels would sell the pier to it as part of Wild Waves’ plan to build the waterpark. It arranged for a construction loan secured by the pier, but needed Nickels’ permission to encumber the portion of the pier the latter retained under its control. Nickels did not sell the pier, but it consented to the mortgage, apparently in exchange for a September 1999 amendment to the lease agreement that required Wild Waves to put $400,000 in escrow in case it defaulted. Disputes developed between Wild Waves and Nickels, they started litigating the lease and *783 non-sale in 2001, the castle and dungeon burned down in January 2002, and Nickels filed Chapter 11 bankruptcy in 2003.[1]
This appeal arises because Wild Waves refused to pay rent and taxes, and put the $400,000 in escrow. The Bankruptcy Court ordered Wild Waves to pay rent of only $87,500 (rather than the stated $250,000) because it could no longer rely on income from the castle and dungeon, but the Court required it to put up the $400,000 deposit. Both parties appealed to the District Court, which in a thorough opinion affirmed in all respects. We follow suit.
The Bankruptcy Court had jurisdiction under 28 U.S.C. § 157(a); the District Court had jurisdiction under 28 U.S.C. § 158(a); we have jurisdiction under 28 U.S.C. § 158(d). We apply the same standard of review to the Bankruptcy Court’s ruling as the District Court, In re Harvard Industries, 568 F.3d 444, 449-50 (3d Cir.2009), reviewing the Bankruptcy Court’s legal conclusions de novo and its factual conclusions for clear error. In re Schick, 418 F.3d 321, 323 (3d Cir.2005). The Bankruptcy Court, the District Court, and the parties in their briefs to us, all applied New Jersey law, and we agree that this is the right law to apply to this New Jersey contract. See In re Merritt Dredging, 839 F.2d 203, 206 (4th Cir.1988) (a bankruptcy court applies choice-of-law rules of the state in which it sits); State Farm v. Simmons’ Estate, 84 N.J. 28, 417 A.2d 488 (1980) (in general, in New Jersey the law of the situs of the contract applies).
Considering extrinsic evidence of the intent of the parties alongside the language of the lease, the Bankruptcy Court decided that they agreed to abate rent if fire destroyed the castle and dungeon. As noted, it reset rent at $87,500 from the previous amount of $250,000. It did so based on an appraised market rate valuation of the leased area available to Wild Waves after the fire. Nickels, which would have received more if the Bankruptcy Court had reduced rent by the proportion of (1) square footage or (2) total annual income lost to the fire, argues that the Bankruptcy Court should have applied these alternative approaches.
New Jersey lets a judge consider extrinsic evidence of the intent of the parties even if contract language is unambiguous. Conway v. 287 Corporate Center, 187 N.J. 259, 901 A.2d 341, 342-43, 347 (2006). Courts determine intent by asking what a reasonable person would think based on the extrinsic evidence and contract language (ie., objective, not subjective, intent governs). See, e.g., Pagnani-Braga-Kimmel Urologic v. Chappell, 407 N.J.Super. 21, 968 A.2d 1242, 1245-46 (N.J.Super.Ct.2008).
Nickels wrote to Wild Waves that it believed the castle and dungeon’s receipts would cover rent. Further, Wild Waves’ principal testified that Nickels gave him documentation of the castle and dungeon’s profits. The contract said that if there were a fire, Wild Waves had to continue to “pay rent, pro rata, for the usable part,” but did not specify in what manner the rent should be proportional. This evidence and language are not enough to show that the parties had a subjective intent to set rent at an appraised value if the castle and dungeon burned, as it does not appear that the parties ever considered how to abate rent if they lost use of the castle and dungeon.
But subjective intent does not matter here. A reasonable person would con- *784 elude that the parties agreed to reduce rent to the market rate if they lost the dungeon and castle. To conclude otherwise would require us to say that Wild Waves agreed to bear the entire risk of loss of the income stream from the castle and dungeon. That is not reasonable.[2]
Nickels argues that the plain language of the contract permitted a reduction only by the proportion of space destroyed by the fire. We decline to read the contract divorced from the extrinsic evidence described above. For even if a contract appears free of ambiguity, in New Jersey extrinsic evidence “is always admissible in aid of [its] interpretation.” Conway, 901 A.2d at 347. But in this case we need more than the words of the contract; while it says the parties will prorate rent, it does not say how the proration works. Thus, the contract is ambiguous on this point.
Nickels further argues that the only other possible interpretation of the lease is that the parties agreed to reduce rent by the proportion of profits destroyed by the fire. For example, if the fire destroyed an annual income stream of $250,000 and Wild Waves was generating $1 million per year from the entire pier, then the parties would reduce rent by 25%. That interpretation is intuitively appealing because it takes into account both the evidence that the parties considered income in setting rent and the pro rata language in the contract. We reject this argument, however, because the record shows that the castle/dungeon was the only income-producing asset in the leased area when the parties negotiated the lease. A reasonable person would conclude that the parties intended rent to revert to market rate if that facility were destroyed.[3]
The lease required Wild Waves to pay one third of the taxes on the entire pier. The Bankruptcy Court abated this to 19.2%, which was the post-fire proportion of the pier’s total value represented by the part leased by Wild Waves. Nickels argues that there should be no tax abatement because the lost income on the castle and dungeon did not change taxes on the pier. We reject this argument because there is evidence that the parties allocated taxes based on the relative value of the leased premises to the value of the entire pier, not the amount of taxes on the pier. Given this evidence (the lease itself is silent on this matter), a reasonable person would conclude that the parties agreed that any post-fire tax percentage should reflect the change in the value of the leased property caused by the fire. The *785 Bankruptcy Court properly gave effect to this agreement.
Turning to Wild Waves’ appeal, the Bankruptcy Court decided that the amendment to the lease required Wild Waves to place $400,000 in escrow. It objects because the amendment says the escrow only lasts until the mortgage matures “in approximately five years,” or fall 2004. But Wild Waves extended the maturity. We agree with the District Court that the best reading of the amendment is that the escrow continues until the mortgage finally matures. The purpose of the escrow was to give security against default by Wild Waves. A reasonable person would conclude that so long as a danger of default exists (ie., the mortgage continues), the escrow continues.
Wild Waves argues that it intended the escrow to last only until the mortgage’s first maturity (ie., approximately five years) because it thought Nickels was going to sell the pier around that time. But that supports the conclusion that the parties intended to tie the escrow to Nickels’ exposure to default. The escrow would have been released upon a sale because the risk to Nickels would be extinguished — it would no longer own the land. (Wild Waves also argues that because Wild Waves has made all its mortgage payments and the value of the property has declined, it no longer presents a credit risk. That may be the case, but the Bankruptcy Court made no such finding. We therefore will not give it effect.)
Wild Waves’ next contention is that the amendment is void because it agreed to amend under economic duress. Specifically, it argues that it entered into millions of dollars of contracts to build the water-park believing that the lease permitted it to mortgage the entire pier. But, according to Wild Waves, Nickels then refused to encumber the roughly one-third of the pier it retained under its control unless Wild Waves signed the amendment. It asserts that it faced major liabilities to its contractors if it did not sign the amendment.
There may be economic duress if a party assents to an improper demand under circumstances in which it has little choice but to do so (ie., the improper demand “deprives the victim of his unfettered will”). See Continental Bank v. Barclay Riding Academy, 93 N.J. 153, 459 A.2d 1163, 1175 (1983). We agree with the District Court that there was no duress. This was obviously correct, as the Bankruptcy Court found that Wild Waves’ principal, who negotiated the amendment, was a lawyer (Nickels’ representatives were not), both parties were seasoned players in the local real estate market, documentary evidence showed that Wild Waves was not actually bound to its construction contracts, and Wild Waves had advance indication from Nickels that it did not intend to encumber its non-leased portion of the pier.
For these reasons, we affirm the grant to Wild Waves of a rent abatement (and the amount of that abatement) as a consequence of the fire that destroyed the castle and dungeon. We also affirm the decision that the $400,000 escrow required by the loan amendment should remain in effect.

. Issues relating to the non-sale have already reached us. See In re Nickels Midway Pier, LLC, 255 Fed.Appx. 633 (3d Cir.2007).

. Nickels is right to suggest that, because Wild Waves never asked the Bankruptcy Court to set rent at the market rate, there is some evidence that Wild Waves did not intend to pay the market rate if it lost the castle and dungeon. But, as we have said, subjective intent does not matter.

. Nickels also argues that the Bankruptcy Court erroneously thought that the area destroyed by the fire was 7,500 square feet (in fact, it was 15,000 because the castle and dungeon had two floors). But the record reveals no such mistake. The appraiser excluded the entire area of the dungeon and castle from its rent calculation. The Bankruptcy Court properly added back into the calculation the part of the pier on which the dungeon and castle once stood because Wild Waves still had use of that area, once the facility’s first floor.
We also reject Nickels’ contention that the Bankruptcy Court should have used 60,000 square feet in calculating rent because the lease agreement stated the leased space as approximately that area. The appraiser reported that the area was in fact closer to 50,000 square feet. It was appropriate for the Bankruptcy Court to correct this imprecision in the lease agreement based on extrinsic evidence.