**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1251-22

NINA SLOAN,

    Plaintiff-Respondent,

v.

MOVING EXPRESS
AND STORAGE,

    Defendant-Appellant.

_____

Submitted February 12, 2024 – Decided March 4, 2024

Before Judges DeAlmeida and Berdote Byrne.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Docket No. DC-010123-21.

Law Offices of Michael Makarov, LLC, attorney for appellant (Michael Makarov, on the brief).

Nina Sloan, respondent pro se.

PER CURIAM

    Defendant Moving Express and Storage (MES) appeals from the November 10, 2022 judgment of the Special Civil Part awarding plaintiff Nina

Sloan $7,500 and dismissing MES's counterclaim in this contract dispute. We reverse and remand for entry of judgment in favor of MES on its counterclaims and a determination of its damages.

I.

On November 10, 2021, Sloan filed a complaint in the Special Civil Part against MES alleging:

> Defendant was supposed to deliver my belong[ings] from Baltimore, MD to Aurora, CO, mid-end of July. No contact + unable to reach Defendant until last week of Oct. Defendant was sub-contracted by movers I hired + paid $1570- prior to moving day unbeknownst to me. Defendant refuses to deliver my belongings without additional payment.

Sloan demanded $7,500 in damages. The demand was based on Sloan's contention she is entitled to abandon her belongings, which MES is storing, and replace them with new items at MES's expense.

MES filed an answer and counterclaim alleging breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, and quantum meruit. MES alleged Sloan executed a contract in which she agreed to pay $2,731 to have MES move her belongings to Colorado and to pay for storage of those items if she failed to retrieve them after thirty days. MES alleged it moved Sloan's belongings to Colorado and she paid only $1,570 of the amount due for

2

the move.  MES alleged it placed Sloan's belongings in storage because she failed to provide a delivery address and to pay the balance due under the contract.  MES sought damages of $1,161 (the remainder of the amount due for moving services), $1,264 in storage fees, and a $300 redelivery fee.  MES also alleged that Sloan's belongings remained in storage, accumulating additional fees.

Sloan testified that she secured a "binding moving estimate" from Cross Country Moving Experts (Cross Country), an entity related to MES, over the telephone to move her belongings from Baltimore to Aurora, Colorado on June 13 or 14, 2021, with delivery approximately one month later.  A written copy of the estimate was admitted as evidence.  The estimate is based on moving 301 cubic feet of belongings at $4.75 per cubic feet.  According to the estimate, the 301 cubic feet was calculated on Sloan's report she had 20 bins of belongings and ten additional items:  a small bookshelf, a chair, a sofa, a television, two tables, a bed frame, a dresser, a mattress, and a bike, each with a cubic feet measurement listed on the estimate.  The estimate sent to Sloan prior to moving day states that because the price is based on the volume of belongings to be moved, "our Professional Crew Supervisor will measure your shipment off in

3

the truck & show you the volume utilized, which will be the actual charge client is responsible to pay."[1]

After applying discounts and surcharges, Cross Country estimated a cost of $1,570 for the move.  The estimate provided thirty days of free storage.  Sloan paid the estimated $1,570 in installments prior to the scheduled move date.

Employees of MES appeared at Sloan's home on the move date, June 13, 2021.  She was unfamiliar with MES and not aware that her agreement with Cross Country would be carried out by MES.  According to Sloan, one of the employees measured her packed belongings.  He told her she had more than 301 cubic feet of belongings and the estimate would have to be revised.  Although Sloan told the MES employee she had fewer items than those on which the initial estimate was based, the employee said his crew would not load the moving truck or touch her belongings unless she agreed to pay an additional $1,161.

---

[1]  An earlier estimate provided to Sloan by Cross Country with the same cost states "[b]e advised that any changes to your order will result in a change to your estimated price.  For example, if you add additional items . . . your price will increase accordingly.  . . .  If on the date of the move you . . . tender additional items to be moved the mover will issue you a new updated written estimate reflecting the change to the total estimated price.  In such a case, a revised written visual estimate must be approved by you and signed prior to any services being performed."

A-1251-22

According to Sloan, the MES employee said he is required to tell all customers that they have more belongings than those listed in their original estimates and must pay more to move their possessions. Sloan testified that the employee said he "gets in trouble" if he does not revise the estimate to charge customers more for their move than the original estimate.

Sloan conceded that, although she had three or four days in which to make alternate arrangements for her possessions, she signed an "Interstate Revised Written Estimate" that notes a "Rescinded Estimate" of 301 cubic feet of belongings and a "New Estimate" of 500 cubic feet of belongings at $4.75 per cubic foot for a total of $2,375. Attached to the revised estimate is an inventory of thirty-one items – ten plastic bins and twenty-one other items – Sloan presented to the MES employees to be moved. Several of the items listed in the inventory were not included in the items on which the original estimate was based, including two wardrobes, a filing cabinet, nine boxes, and a laundry basket.

After application of a revised fuel surcharge and application of a credit for Sloan's prior payments, the revised estimate stated $1,161 remained outstanding and was to be paid upon delivery of Sloan's belongings in Colorado.

A-1251-22

Sloan testified she signed the revised estimate under duress because she was moving "in three to four days" and "had no one to leave my things with." According to her testimony,

> I just knew I needed my belongings to get to where I was. I'm like, you know what, if this is what I have to do to get you guys to move my stuff because I don't have the money to go rearrange to do something else and get another mover at the last minute. I booked this months in advance. And this guy sprung this on me at the last minute and I signed it because I can't have my things left here in Baltimore because I'd already given up my place. I couldn't leave my things in other[] people's apartment when I was leaving. I had no choice but to sign it to get my things to me.

Sloan added, "I was like you know what, I'll just sign it and deal with this later . . . ."

Sloan testified that after moving day, she had difficulty contacting MES and obtaining a date certain on which her belongings would be delivered to Aurora, Colorado. She admitted she refused to provide MES with a delivery address until she received a call from an MES driver stating that the driver was in Aurora with her belongings. When she received such a call, she intended to rent a storage unit and provide the driver with the address of the storage unit for delivery.

6

A representative of MES testified at trial. She said the company attempted to reach Sloan in Colorado several times without success. When contacted, Sloan said she wanted her belongings delivered for free.

After several months of Sloan refusing to provide MES with an address for delivery of her belongings, the company transported Sloan's possessions to Aurora in October 2021. According to MES's representative, Sloan did not reply to their attempts to contact her for a delivery address. The company, therefore, placed her belongings in a storage unit in Aurora. MES has been incurring monthly fees for the storage of Sloan's belongings.[2]

Sloan testified she did not seek the return of her belongings because she speculated they may have been damaged in storage. She produced no evidence to support her speculation. She instead filed suit for monetary damages to buy new possessions.

The trial court issued an oral opinion at the end of trial. The court concluded that Sloan entered into a contract with Cross Country when she secured the original estimate. The court then appears to have concluded that the

---

[2] The trial court adduced no evidence with respect to whether Sloan's belongings remained in storage at the time of trial. We discern from MES's brief filed in this court that the items remain in storage at MES's expense.

A-1251-22

revised estimate was not a valid contract because it was the product of deceptive

practices or too vague.  The court found:

> it is an inherently inexact borderline deceptive practice
> to give people an estimate telephonically without in
> today's day and age an exchange of photographs to
> show what the items are so that that can be confirmed.
> It is inherently inexact, and as I said, inherently
> borderline deceptive to then have people build their
> lives around a move, have three people from a different
> company appear on the day of where . . . Sloan testified
> she was expecting her items to be picked up so she
> could move that very Wednesday, having made
> arrangements with her landlord . . . and demand
> additional monies.

The court continued,

> I have no idea on what these surcharges were based.
> Presumably, . . . this increased cubic unit calculation,
> cubic feet.  Obviously, that would include a higher cost
> for fuel, et cetera.  But, again, I have – I don't see how
> its actually calculated based upon what presumably
> industry standards (sic).  There are so many
> unanswered questions here.

The court then concluded that Sloan signed the revised estimate under

duress.  After reading the definition of duress from the civil jury charge, the

court stated:

> [a]nd this is what the [c]ourt rests its decision on with
> respect to the finding of no liability on . . . Sloan's end.
> She was in a very tight spot with the imminent move
> out date, having reasonably relied on a document that
> was prepared by the defendant[] or defendant's agent,

8

in which she has said several times the cost of the job, total job cost is $1,570 (indiscernible) notice that she wants to move, relocate her life cross country. She had to pay another $1,100 on the spot. Unconscionable. Bad business practice. As I say, borderline deceitful.

. . . .

[D]efinitely a coercive situation . . . she should not have been subjected to and a terrible business practice. So I'm not finding any liability on her part.

The trial court turned to damages, apparently based on its conclusion that the original estimate was a contract and that MES, acting as an agent of Cross Country, breached that contract. With respect to damages, the court found that MES failed in its duty to mitigate damages, concluding that the company rebuffed Sloan's repeated attempts to retrieve her belongings.[3] The court found that Sloan's demand for $7,500 was "an arbitrary evaluation" of the value of her belongings. However, after reviewing an itemized list of belongings Sloan contends were moved by MES, the court found that "$7,500 is a reasonable figure" to compensate Sloan. The court reached this determination despite the fact that the list produced by Sloan did not include an individual value for any

---

[3] It is not clear why the court addressed MES's failure to mitigate damages. The duty to mitigate damages is imposed on the party entitled to damages for a breach of contract. State v. Weiswasser, 149 N.J. 320, 329-330 (1997). The court had already concluded Sloan had no liability to MES for breach of contract.

9

of the items and she provided no testimony with respect to the value of the individual items. The court dismissed MES's counterclaims.

A November 10, 2022 judgment memorializes the court's decision.

This appeal followed. MES argues: (1) the trial court erred when it concluded Sloan signed the revised estimate under duress; (2) the damage award is not supported by sufficient proofs; and (3) MES is entitled to a judgment in its favor as a matter of law on its counterclaims.

II.

Our scope of review of the judge's findings in this nonjury trial is limited. We must defer to the judge's factual determinations, so long as they are supported by substantial credible evidence in the record. Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 483-84 (1974). This court's "[a]ppellate review does not consist of weighing evidence anew and making independent factual findings; rather, [this court's] function is to determine whether there is adequate evidence to support the judgment rendered at trial." Cannuscio v. Claridge Hotel & Casino, 319 N.J. Super. 342, 347 (App. Div. 1999). However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm., 140 N.J. 366, 378 (1995).

We begin with the trial court's conclusion that Sloan signed the revised estimate under duress and, as a result, did not enter into a contract with MES. "[T]here are circumstances under which economic pressure may invalidate an otherwise enforceable contract." Cont'l Bank of Pa. v. Barclay Riding Acad., Inc., 93 N.J. 153, 175 (1983). "Economic duress occurs when the party alleging it is the victim of a wrongful or unlawful act or threat, which deprives the victim of his unfettered will." Quigley v. KPMG Peat Marwick LLP, 330 N.J. Super. 252, 263 (App. Div. 2000) (internal quotation marks omitted). "[T]he decisive factor is the wrongfulness of the pressure exerted" on the party seeking to void the contract. Cont'l Bank, 93 N.J. at 177. "The term 'wrongful' in this context encompasses more than criminal or tortious acts, for conduct may be legal but still oppressive." Ibid. "In addition, duress entails inadequate consideration." Quigley, 330 N.J. Super. at 263.

"The situations are so varied that one cannot be sure of a simple formula" for finding economic duress. Cont't Bank, 93 N.J. at 177 (quoting West Park Ave., Inv. v. Twp. of Ocean, 48 N.J. 122, 129 (1966)). However, the following generalizations are relevant in determining if there was duress:

> [w]here there is adequacy of consideration, there is generally no duress . . . . Whenever a party to a contract seeks the best possible terms, there can be no rescission merely upon the grounds of "driving a hard bargain."

A-1251-22

> Merely taking advantage of another's financial difficulty is not duress. Rather, the person alleging financial difficulty must allege that it was contributed to or caused by the one accused of coercion . . . . Under this rule, the party exerting pressure is scored only for that for which he alone is responsible.
>
> [Ibid. (quoting 13 S. WILLISTON, CONTRACTS § 1617 at 708 (3d ed. 1970)).]

We are constrained to reverse the trial court's conclusion that Sloan signed the revised estimate under duress sufficient to vitiate the formation of a contract. An analysis of this issue must consider the original estimate, the validity of which is undisputed. That document expressly provides that "our Professional Crew Supervisor will measure your shipment off in the truck & show you the volume utilized, which will be the actual charge client is responsible to pay." This provision is unequivocal. Sloan agreed the cost of moving her belongings would be based on the actual size of those belongings as measured on moving day. The trial court's finding that Sloan was surprised by a borderline deceptive practice when MES's staff measured her belongings to determine their size before putting them on the truck is not, therefore, supported by the record.

The MES moving crew did exactly what Sloan agreed to in the initial estimate. They measured her belongings to determine the actual cost of moving them to Colorado. The record establishes Sloan had more and different items

12

than those she reported to Cross Country to formulate the original estimate. Sloan elected to obtain an estimate over the telephone and was notified in writing in the initial estimate that, if on moving day her belongings took up more space than she reported to Cross Country over the telephone, the actual cost of the move would be recalculated. She was, therefore, aware that there might be a change in the estimate on moving day and decided to take that risk by agreeing to retain moving services based on the initial telephone estimate.

Nor do we see support in the record for the trial court's finding that other circumstances surrounding her agreement to pay the amount reflected in the revised estimate constituted duress. The record contains no evidence that Sloan received inadequate consideration for the additional charge. The revised estimate was calculated at $4.75 per cubic foot for the additional 200 cubic feet of belongings Sloan presented on moving day. This is the exact rate to which she agreed in the first estimate for the original 300 cubic feet of belongings.

In addition, Sloan was not, as the trial court found, required "to pay another $1,100 on the spot" on moving day. The MES employees, who had not placed Sloan's belongings on the moving truck, agreed she could pay the additional charge upon delivery of her belongings in Colorado approximately one month later. Moreover, when presented with the revised estimate, Sloan

13

had, according to her testimony, "three or four days" before she was required to vacate her home. That is sufficient time in which Sloan, if unsatisfied with the revised estimate, could have arranged for another vendor to move her belongings to Colorado. We note that on moving day, Sloan did not have an address in Colorado for delivery of her belongings. She admitted it was her intention to locate a storage unit for her possessions when they arrived in Aurora. She did not, therefore, intend to immediately move her belongings into her new home. Thus, in the three or four days before she was required to vacate her Baltimore home, Sloan, if unsatisfied with the revised estimate, could have secured a storage unit in Baltimore for her possessions to remain until she could arrange for them to be moved to Colorado. Instead, Sloan elected to sign the revised estimate and "deal with this later," apparently never intending to pay the cost for moving her additional belongings to Colorado. We conclude the evidence in the record establishes Sloan willingly agreed to the revised estimate and the terms set forth in that document and authorized MES to move her belongings to Colorado.

Having carefully reviewed the record, we conclude the revised estimate was a valid contract between Sloan and MES. "A contract arises from offer and acceptance and must be sufficiently definite 'that the performance to be rendered

by each party can be ascertained with reasonable certainty.'" Weichert Co. Realtors v. Ryan, 128 N.J. 427, 435 (1992) (quoting Borough of W. Caldwell v. Borough of Caldwell, 26 N.J. 9, 24-25 (1958)). To create an enforceable contract, the "parties [must] agree on essential terms and manifest an intention to be bound by those terms . . . ." Ibid. The record establishes that the revised estimate meets each of these factors.

We also conclude the record establishes Sloan breached the contract by refusing to pay the agreed upon cost of MES moving her belongings to Colorado. Sloan admits she refuses to pay any amount more than what was provided in the initial estimate. Although the trial court found that MES failed to fulfill its duty to mitigate its damages, we find insufficient support in the record for that determination. The trial court found MES made insufficient efforts to deliver Sloan's belongings to her. Yet, Sloan admits she steadfastly refused to pay her outstanding balance under the revised estimate, a contractual condition for the return of her belongings. It is not clear what MES could have done, short of forfeiting its right to collect Sloan's outstanding balance, to reunite her with her possessions.

Although MES submitted evidence of its damages as of the trial date, it also informed the court that Sloan's belongings remained in storage at MES's

15

expense. The current record, therefore, does not reflect the damages MES alleges accumulated after trial. As a result, it is necessary to remand this matter for a determination of MES's damages arising from Sloan's breach of contract.

The November 10, 2022 judgment is reversed. The matter is remanded for entry of judgment in favor of MES on its counterclaims, dismissal of Sloan's claims, and a determination of MES's damages for Sloan's breach of contract. We offer no opinion with respect to the disposition of Sloan's belongings.

Reversed and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1251-22